## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Sue Ann Adams, Patricia J. Pettenger, and Marla K. Snead on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>U.S. Bancorp, the Benefits Administration Committee and John/Jane Does 1-5,<br><br>Defendant. | Case No.:<br><br><br>**<u>CLASS ACTION COMPLAINT</u>** |

Plaintiffs Sue Ann Adams, Patricia J. Pettenger, and Marla K. Snead, by and through their attorneys, on behalf of themselves and all others similarly situated, based on personal knowledge with respect to their own circumstances and based upon information and belief pursuant to the investigation of their counsel as to all other allegations, allege the following.

## <u>INTRODUCTION</u>

1.     This is a class action against U.S. Bancorp ("U.S. Bank"), the U.S. Bank Benefits Administration Committee ("BAC"), and the BAC's individual members (collectively "Defendants") for providing early retirement benefits under the U.S. Bank Pension Plan (the "Plan") and the U.S. Bank Legacy Pension Plan (the "Legacy Plan") (together, the "Plans") that are not actuarially equivalent to the participant's single life annuity at the participant's normal retirement date as required by the Employee Retirement Income Security Act of 1974 ("ERISA"). Defendants' violation of ERISA's actuarial

equivalence requirements caused retirees to lose part of their vested retirement benefits, in violation of ERISA, and to receive less in benefits each month.

2.　　U.S. Bank sponsors the Plans to provide retirement benefits for its employees. Beginning in 2002 for most, and by 2003 for all, participants began accruing benefits under a new, final average pay formula ("FAP Formula"), which U.S. Bank calls a participant's "Part B" benefits. Plaintiffs' claims stem from Defendants' methods for reducing the Part B benefits under the Plans when a participant starts collecting an early pension.

3.　　ERISA § 204(c)(3), 29 U.S.C. § 1054(c)(3), provides that retirement benefits that commence prior to a plan's normal retirement date (typically age 65) be actuarially equivalent to the single life annuity ("SLA") that the participant could have selected at the normal retirement date ("NRD") based on reasonable actuarial assumptions. Determining whether two benefit forms are actuarially equivalent means comparing the present value of the total amounts expected to be received under the two forms of benefits to make sure they are equal. Using unreasonable actuarial assumptions or using fixed factors that are based on unreasonable actuarial assumptions to calculate early retirement benefits can depress those benefits resulting in benefits that are not actuarially equivalent to a participant's SLA at NRD.

4.　　The Plans' normal retirement age is 65. When participants retire early, Defendants calculate their Part B benefits by applying a prescribed early commencement factor ("ECF") to their normal retirement benefit (*i.e.,* the participant's age-65 SLA), which

reduces their benefit by a set percentage. For example, an ECF of .90 means that a participant receives 90% of the SLA he or she could have received at age 65.

5.      The ECFs that Defendants apply to participants' Part B benefits are unreasonable, excessive, and punitive, causing participants that retire early to receive benefits that are less than the actuarial equivalent of their age-65 SLA.  The ECFs have not changed in 20 years and the actuarial assumptions upon which they were originally based are unreasonable and outdated.  The ECFs depress the present value of early retirement benefits resulting in participants receiving monthly payments that are materially *lower* than they would be if Defendants used reasonable ECFs. For example, participants who retired at age 55 in 2021 could have their benefits improperly reduced by an additional *40 percent* compared to ECFs generated by actuarial assumptions determined by the U.S. Treasury Department to be reasonable at the time benefits began.

6.      Defendants are causing Plaintiffs and the Class to receive less than they are entitled to each month. By excessively reducing Plaintiffs' benefits to account for their retirements before age 65, Defendants failed to provide them, and other similarly situated Class members, with early retirement benefits that are actuarially equivalent to their SLAs at NRD in violation of ERISA § 204(c)(3). Defendants also violated ERISA's anti-forfeiture rule, ERISA § 203(a), 29 U.S.C. § 1053(a), by causing Plaintiffs and Class members to unknowingly forfeit and lose part of their vested benefits.

7.      Plaintiffs seek an order from the Court (1) declaring that the ECFs used to calculate benefits under Part B of the Plans produces benefits that are less than the actuarial equivalent of the age-65 SLA; (2) requiring Defendants to pay all amounts improperly

3

withheld in the past and to be withheld in the future;  (3) requiring Defendants to recalculate Plaintiffs' early retirement benefits in a manner consistent with ERISA § 204(c)(3)'s actuarial equivalence requirement; (4) requiring Defendants to increase the amount of Plaintiffs' future benefit payments; and (5) such other relief as the Court determines to be just and equitable.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA.

9.     This Court has personal jurisdiction over Defendant U.S. Bank because it is headquartered in, transacts business in, and has significant contacts with this District, and because ERISA provides for nationwide service of process.

10.    This Court has personal jurisdiction over the BAC because it is headquartered in, transacts business in, and has significant contacts with this District, and because ERISA provides for nationwide service of process.

11.    This Court has personal jurisdiction over the individual members of the BAC because, upon information and belief, each transacts business in, resides in, and has significant contacts with, this District, and because ERISA provides for nationwide service of process.

12.    Venue is proper in this District under ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all the violations of ERISA occurred in this District and

Defendants may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendant U.S. Bank does business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

**PARTIES**

**Plaintiffs**

13.     Plaintiff Sue Ann Adams is a resident of Nevada, Missouri.  She worked for U.S. Bank and accrued Part B benefits under the Plan from January 1, 2003, until she started receiving benefits on August 1, 2021, when she was age 63 and six months.

14.     Plaintiff Patricia Pettenger is a resident of Sterling, Illinois. She worked for U.S. Bank and accrued Part B benefits under the Plan from January 1, 2003, until she started receiving benefits on April 1, 2020, when she was age 64.

15.     Plaintiff Marla Snead is a resident of Linville Falls, North Carolina. She worked for U.S. Bank and accrued Part B benefits under the Plan from January 1, 2003, until she started receiving benefits on July 1, 2019, when she was age 55 and 2 months.

**Defendants**

16.     Defendant U.S. Bank is a financial services company headquartered in Minneapolis, Minnesota that provides a full range of financial services, including lending and depository services, cash management, capital markets services, investment management, credit card services and mortgage banking.

17.     The BAC is a named fiduciary under ERISA.  U.S. Bank appoints the Committee members.

18.     John/Jane Does 1 through 5, inclusive, are the individual members of the BAC responsible for administering the Plan throughout the Class Period.  Their names and identities are not currently known.

## APPLICABLE ERISA REQUIREMENTS

### *Early Retirement Benefits Must Be Actuarially Equivalent*

19.     ERISA § 204(c)(3), 29 U.S.C. § 1054(c)(3), provides that if a participant takes his or her benefit before normal retirement age, or in a form other than a single life annuity, the accrued benefit must be the "actuarial equivalent" of the single life annuity the participant could have taken at age 65.  "What these provisions mean in less technical language is that: (1) the accrued benefit under a defined benefit plan must be valued in terms of the annuity that it will yield at normal retirement age; and (2) if the benefit is paid at any other time (e.g., on termination rather than retirement) or in any other form (e.g., a lump sum distribution, instead of annuity) it must be worth at least as much as that annuity." *Esden v. Bank of Boston*, 229 F.3d 154, 163 (2d Cir. 2000).

20.     The Treasury Regulation for the Tax Code provision corresponding to ERISA § 204 (26 U.S.C. § 411), states that the determination of whether two benefits are actuarially equivalent shall be made "by the Commissioner [of Internal Revenue]" 26 C.F.R. § 1.411(c)-1(e). According to a regulation adopted by the Commissioner, early retirement benefits must be calculated "in accordance with reasonable actuarial assumptions." 26 C.F.R. § 1.401(a)-14(c)(2).

21.     ERISA § 203(a), 29 U.S.C. § 1053(a), also provides that an employee's right to the vested portion of his or her normal retirement benefit is non-forfeitable. The Treasury

6

regulation for the Tax Code provision corresponding to ERISA § 203 (26 U.S.C. § 411), prohibits "adjustments in excess of reasonable actuarial reductions. . . ."  26 C.F.R. § 1.411(a)-4(a).

22.    "Two modes of payment are actuarially equivalent when their ***present values are equal*** under a given set of assumptions." *Stephens v. US Airways Group, Inc.,* 644 F.3d 437, 440 (D.C. Cir. 2011) (emphasis added) (citing Jeff L. Schwartzmann & Ralph Garfield, Education and Examination Comm. of the Society of Actuaries, Actuarially Equivalent Benefits 1, EA1-24-91 (1991) ("Schwartzmann & Garfield").[1] Actuarial equivalence should be "cost-neutral," meaning that neither the plan nor the participants should be better or worse off if a participant selects early retirement benefits or an age-65 SLA. *See Bird v. Eastman Kodak Co.*, 390 F. Supp. 2d 1117, 1118–19 (M.D. Fla. 2005); *see also Berger v. Xerox Corp. Ret. Income Guarantee Plan*, 338 F.3d 755, 761 (7th Cir. 2003) ("Any distribution that [a participant] receives earlier is the commutation of . . . accrued benefits to their present-value"); *Smith v. Rockwell Automation*, No. 19-C-0505, 2020 WL 620221, * 7 (E.D. Wisc. Jan. 10, 2020) ("plans must use the kind of actuarial assumptions that a reasonable actuary would use at the time of the benefit determination.")

23.    Under ERISA, "present value" means "the value adjusted to reflect anticipated events. Such adjustments shall conform to such regulations as the Secretary of the Treasury may prescribe." ERISA § 3(27), 29 U.S.C. § 1002(27). The Secretary has

---

[1]    According to Merriam Webster: "Equivalent" means "equal." Available at: https://www.merriamwebster.com/dictionary/equivalent. "Equal" means the "same." Available at: https://www.merriamwebster.com/dictionary/equal

prescribed numerous regulations explaining how calculating present value requires the use of reasonable actuarial assumptions:

      (a)    Treasury regulations provide that "[e]quivalence may be determined, on the basis of consistently applied **reasonable actuarial factors**, for each participant or for all participants or reasonable groupings of participants." 26 C.F.R. § 401(a)-11(b)(2) (emphasis added).

      (b)    A plan must determine optional benefits using "a single set of **interest and mortality assumptions that are reasonable** . . . ." 26 C.F.R. § 1.417(a)(3)-1(c)(2)(iv) (emphasis added).

      (c)    With respect to benefits under a lump sum-based formula, any optional form of benefit must be "at least the actuarial equivalent, using **reasonable actuarial assumptions** . . . ." 26 C.F.R. § 1.411(a)(13)-1(b)(3) (emphasis added).

## SUBSTANTIVE ALLEGATIONS

### I.    The Plan

24.    The Plan is administered by U.S. Bank, which has delegated to the BAC the role of supervising the general operation and administration of the Plan.

25.    The Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(a)(A).

26.    The Plan is a defined benefit plan within the meaning of ERISA § 3(35), 29 U.S.C. § 1002(35).

### A.    Benefit Accrual Formulas

27.     The Plan has different benefit accrual formulas based on an employee's dates of service.  As of January 1, 2002, the U.S. Bank Cash Balance Plan ("pre-2002 CB Plan") and the Firstar Plan, which included the Mercantile Plan, were merged. Benefits accrued before that date are referred to as "Part A" benefits.

28.     Beginning January 1, 2002, for participants in the pre-2002 CB Plan and the Firstar Plan and January 1, 2003, for participants in the Mercantile Plan, the Plan changed to the Final Average Pay formula.  Under the FAP formula, participants earned retirement benefits based on their highest average pay and the number of years of service.  These benefits are referred to as "Part B" benefits.

29.     Effective November 15, 2009, new employees did not accrue benefits under the Part B, FAP formula; instead, they would participate in the 2010 Cash Balance Plan, a component of the Plan.  *See* 2016 Plan Restatement, Appendix I.  Under the 2010 Cash Balance Plan, participants receive an annual pay credit to a hypothetical plan account and earn interest on those credits.  *See* 2010 Cash Balance Plan at § 2.1.1.  These benefits are referred to as "Part C" benefits.

30.     Starting in 2010, participants with Part B benefits could choose whether they would continue to accrue Part B benefits or begin accruing Part C benefits under the 2010 Cash Balance Plan's formula.  Plan participants that did not choose to accrue benefits under the Part C formula continued to accrue Part B benefits.

31.     This case concerns participants who receive Part B benefits and concerns ***only*** their Part B benefits.

**B.      The Part B Early Commencement Factors**

32.      The Plans adjust a participant's benefits when he or she retires early. To account for the additional years of payments a participant receives when he or she retires before age 65, the Plans reduce the amount of a participant's benefit compared to the benefit the participant would have received at age 65. A participant who retires early is foregoing a higher monthly amount in exchange for additional benefit payments (*i.e.*, those before age 65).

33.      Participants can begin receiving their Part B benefits at age 55 if they have five or more years of service. *Id.*, §§ 5.2 and 2.1.14. When participants with Part B benefits retire before age 65, their age-65 SLA is reduced by the ECFs in the Plans. *Id.*, § 5.2.2.

34.      Defendants apply the following ECFs to a participant's age-65 SLA to calculate early Part B benefits:

| Age | Part B's ECFs |
|-----|---------------|
| 55  | 0.38          |
| 56  | 0.42          |
| 57  | 0.46          |
| 58  | 0.50          |
| 59  | 0.55          |
| 60  | 0.60          |
| 61  | 0.66          |
| 62  | 0.73          |
| 63  | 0.81          |
| 64  | 0.90          |
| 65  | 1.00          |

35.  The Plans adjust the ECF to account for the months between full year age categories.  For example, Defendants apply an ECF of .40 when a participant retires at 55 years and 6 months. So, if a participant's age-65 SLA is $1,000 a month, the participant's SLA at 55 and 6 months is $400.

### C.  Benefit Forms Other than an SLA

36.  The Plans offer several different benefit forms other than an SLA.  To calculate the amount payable under these other forms, the Plans adjust a participant's benefit amount payable as an SLA when the participant retires.

37.  The Plan offers three joint and survivor annuity ("JSA") options that pay a specified percentage of the participant's benefit to a spouse or beneficiary after the participant's death. A 50% JSA pays the spouse or beneficiary a monthly payment that is half the monthly benefit amount that was paid to the participant during the participant's lifetime. Because JSAs could potentially pay monthly benefits over the course of two lifetimes instead of one, the participant's benefit is reduced compared to the SLA he or she would have received.

38.  The Plan calculates a 50% JSA by multiplying the SLA that the participant could have received when the participant retires by .92, regardless of the participant's age. For instance, if a participant was entitled to receive $1,000 a month as an SLA, the participant would receive $920 if she chose a 50% JSA.

39.  The 75% JSA is calculated by multiplying a participant's SLA by .89.  The 100% JSA is calculated by multiplying a participant's SLA by .86.  Like the 50% JSA

factors, the .89 and .86 factors are fixed and do not change depending on the participant's age.

40.     The Plans also offer Estate Protection Annuities ("EPAs"), which can be combined with the SLA, the 50% JSA or the 100% JSA, that pay a lump sum benefit to the participant's beneficiary after the participant's death.

41.     In addition, participants can receive their Part B benefit as a lump sum if it has a present value of less than $5,000, calculated using the mortality table identified in 26 U.S.C § 417(e)(3)(B) of the Internal Revenue Code (the "Applicable Mortality Table") and the segment interest rates under § 417(e)(3)(C) (the "Applicable Interest Rates") (collectively the "Treasury Assumptions") from October of the previous year.

### D.     The Legacy Plan

42.     On August 26, 2020, U.S. Bank amended the Plan to spin-off into the Legacy Plan the liabilities relating to (1) participants that had retired before January 1, 2020, and (2) terminated vested participants.  The amendment did not change the Plan's existing terms or those that Defendants applied to calculate the Part B benefits of existing retirees. The Plan and the Legacy Plan "have substantively identical terms, and the spinoff did not affect any benefit amounts accrued by Plan participants." Plan's 2020 Form 5500, Notes Financial Statements at 4.

43.     Under this amendment, Plaintiffs remained participants in the Plan.  When they retired, Defendants calculated their Part B benefits by using the same ECFs and conversion factors that they had applied to participants in the Legacy Plan.

## II.     The Concept of Present Value

44.     ERISA requires that a plan participant receive the "actuarial equivalent" of the accrued benefit payable at "normal retirement age." ERISA § 204(c)(3), 29 U.S.C. § 1054(c)(3).  Two benefits are actuarially equivalent if the present values of the two benefits — calculated using the same, reasonable actuarial assumptions — are the same. *Stephens,* 644 F.3d at 440.  This means that a participant's early retirement benefit should have the same present value — based on reasonable actuarial assumptions — as the SLA the participant could have taken when he or she reached normal retirement age.  *See* 26 C.F.R. § 1.401(a)-14(c)(2).  Determining whether an early retirement benefit is actuarially equivalent to the age-65 SLA requires calculating the present value of both benefits.

45.     Calculating the present value of two benefit forms generally requires two actuarial assumptions: an interest (or discount) rate and a mortality table.

46.     Because benefit payments from a defined benefit plan are fixed as of the date a participant (or, sometimes, their surviving beneficiary) begins receiving benefits — the Benefit Commencement Date or "BCD" — determining whether an early retirement benefit is actuarially equivalent to an age-65 SLA requires comparing the present values of both benefits using interest and mortality rate assumptions that were reasonable as of the participant's BCD.

### A.     Discount Rates

47.     A discount rate is used to determine the present value of each future payment that a participant will receive.  The rate is based on the time value of money, meaning that money available now is worth more than the same amount in the future due to the ability

to earn investment returns.  As long as interest rates are greater than 0%, a future payment is not worth as much to a recipient as a current payment. The further in the future the payment, the less it is worth to the recipient.

48.     The rate used is often called a "discount rate" because it discounts to the present the value of a future payment.  When calculating present value, the higher the interest rate assumption — mortality rates being equal — the lower the amount of the benefit and the lower the ECF.

49.     A discount rate may be based on a single rate or a series of rates, such as a yield curve. For example, a discount rate could be a single rate of 5% or it could be based on a yield curve that, for example, uses a 2% rate to discount the first payment due and a 5% rate to discount the last payment. The "segment" interest rates set by the Treasury Department and prescribed for the calculation of lump sum benefits by ERISA § 205(g)(3), 29 U.S.C. § 1055(g)(3), and § 417(e)(3) is one way that a pension plan could select a discount rate for calculating pension benefits. The § 417(e) rates are based on corporate bond rates and provide an average interest rate for years 0–5 ("1st Segment"), years 5–19 ("2nd Segment") and years 20 and later ("3rd Segment").  26 U.S.C. § 417(e)(3)(C) and (D). Other commonly used yield curves are the Mercer Yield Curve and the FTSE Pension Liability Index which are also based on corporate bond rates. These indexes are each updated on a monthly basis.

50.     For the discount rate that a defined benefit plan uses to calculate ECFs to be reasonable, it must be based on prevailing market conditions and projections of future

market conditions when the payments will be made. In other words, the discount rate must "reflect anticipated events." *See* 29 U.S.C. § 1002(27).

51.     Since 1987, the Financial Accounting Standards Board has required that plan sponsors use a discount rate derived from the yields of high-quality bonds to measure their pension obligations.  Starting in the late 1990s, there was a shift towards using high-quality corporate bond yields to determine discount rates when calculating pension liabilities. For example, the Pension Protection Act of 2006 provided that corporate bond yields be used to set the discount rates for defined benefit plan funding and for calculating lump sum payments as alleged above.

52.     Using bonds with maturations that match (or closely resemble) the projected future pension payments provides an accurate indicator of "anticipated events" and is, therefore, appropriate for calculating the present value of future payments. For example, the interest rate for a bond with a 20-year maturity is an accurate way of calculating the value of a pension payment expected to be made in 20 years.  Thus, pension plans should adopt a rate or series of rates that closely reflect the yields of high-quality corporate bonds when selecting an interest rate for present value calculations.

53.     The Actuarial Standards Board ("ASB") — the body responsible for drafting the Actuarial Standards of Practice ("ASOPs") — provides standards for determining discount rates. ASOP 27 explains that discount rate assumptions should be "reasonable" and should account for "historical and current economic data that is relevant as of the measurement date." *See* ASOP 27, § 3.6. In other words, the ASOPs provide for the use of

"a hypothetical bond portfolio whose cash flows reasonably match the pattern of benefits paid in the future." *Id*.

54.     An interest rate reflecting corporate bond yields, like the § 417(e) segment rates, would have been reasonable to use when calculating the ECFs the Plans applied to participants' Part B benefits at BCD.

55.     U.S. Bank's methodology for measuring its pension liabilities is strikingly similar to how the Segment Rates are determined, as explained in ¶ 49 above, as both use corporate bond yields to determine the present value of future payments.

56.     The discount rate that U.S. Bank uses in its 10Ks to measure the present value of its pension liabilities combines the future payments that it expects to make to each participant.  The rates U.S. Bank used were:

| Year Ending | Discount Rate |
|---|---|
| 12/31/2015 | 4.45% |
| 12/31/2016 | 4.27% |
| 12/31/2017 | 3.84% |
| 12/31/2018 | 4.45% |
| 12/31/2019 | 3.40% |
| 12/31/2020 | 2.75%[2] |

---

[2]     The interest rates used in US Bank's 10-Ks from 2015 through 2021 can be found in at:
https://ir.usbank.com/investor-relations/financial-information/sec-and-other-filings?field_nir_sec_form_group_target_id%5B%5D=471&field_nir_sec_date_filed_value=#views-exposed-form-widget-sec-filings-table

The single discount rates that U.S. Bank discloses closely track those in corporate indexes such as the Mercer Yield Curve and the FTSE Pension Liability Index that are widely used in the pension industry and would have been reasonable discount rates to use when determining the ECFs the Plans applied to participants' Part B benefits at BCD.

### B. Mortality Tables

57.     A mortality table predicts how many people at a given age will die before attaining the next higher age.  Mortality tables have been updated periodically to account for improvements in sanitation, diet, medicine, and general lifestyle for U.S. residents, and in data quality and statistical modeling.

58.     More recent mortality tables are "two-dimensional" in that the rates are based not only on the age of the individual but the year of birth.  The Society of Actuaries, an independent actuarial group, publishes the mortality tables that are the most widely-used by defined benefit plans and are developed from the mortality experience of pension plan participants. The SOA published new mortality tables in 1971, 1983, 1984 (the "UP 1984"), 1994 (the "1994 GAR"), 2000 (the "RP-2000"), 2014 ("RP-2014") and 2019 (the "PRI-2012") to account for changes to a population's mortality experience.

59.     Like the interest rate assumption, the mortality assumption should reflect "anticipated events." ASOP 35 states that an actuary should select "reasonable" demographic assumptions that take "into account historical and current demographic data that is relevant as of the measurement date," and reflect "the actuary's estimate of future experience. . . ." ASOP 35, ¶ 3.3.5.  Paragraph 3.5.3 of ASOP 35 directs the actuary to use

an assumption that "reflect[s] the effect of mortality improvement both before and after the measurement date." *Id.*, ¶ 3.5.3.

60.    Since mortality assumptions must account for anticipated improvements in mortality between the promulgation of new mortality tables, in the years between the publication of a new mortality table, mortality rates are often "projected" to future years using a mortality improvement scale to account for expected improvements in mortality. For example, the RP-2014 mortality table — which remains a commonly used mortality table — is projected forward using a mortality improvement scale to account for additional reductions in mortality rates that have occurred since 2014.

61.    Life expectancies shown in standard mortality tables used to perform pension calculations are much higher for more recent tables than those shown in mortality tables from decades ago, as shown in this chart:



Source: Aon Hewitt, *Society of Actuaries Finalizes New Mortality Assumptions: The Financial and Strategic Implication for Pension Plan Sponsors* (November 2014) at 1.

62.     Older mortality assumptions (*i.e.*, those using a mortality table with higher probabilities of death at a given age) generate lower present values of future payments, and the amount of the monthly benefit decreases. Accordingly, the use of older mortality assumptions results in lower ECFs and lower Part B benefits for those that retire before age 65.

63.     U.S. Bank has recognized that mortality rates have improved, using current mortality tables to calculate its pension liabilities in its financial statements.   Under Generally Accepted Accounting Principles ("GAAP"), the mortality assumption "should represent the 'best estimate' for that assumption as of the current measurement date." Accordingly, on the recommendation of its "independent actuary," U.S. Bank used the RP-2014 mortality table with a customized improvement scale at the end of 2014.   *See*, *e.g.*, Plan's 2014 Form 5500, Financial Statements at 21–22.   U.S. Bank has continued to use the RP-2014 mortality table as its "best estimate" of Plan participant mortality in each subsequent year.

64.     The custom mortality tables that U.S. Bank has used as its "best estimate" have closely tracked the "Applicable Mortality Tables" that the Treasury Department has approved each year during the Class Period and that U.S. Bank uses to calculate several forms of benefit, including the ECFs for Part C.

65.     Throughout the Class Period, the use of the mortality table prescribed by § 417(e) would have been ***reasonable*** to use when calculating ECFs for the Plan's Part B benefits on each participant's BCD.

### III.    The Plans Do Not Provide Early Part B Benefits That Are Actuarially Equivalent

### A.    The Part B ECFs Are Unreasonable.

66.    The Plans do not specify the mortality or discount rate assumptions underlying the Part B ECFs.  Rather, the ECFs are fixed, stated as a percentage of the participant's age-65 SLA.  While the actuarial basis is not stated, the ECFs that apply to Part B benefits have not changed since 2002, despite substantial changes in mortality and interest rates that would generate higher ECFs.  For example, life expectancies increased by four years and the discount rates have declined.

67.    The Part B ECFs are not reasonable as of each participant's BCD and do generate early retirement benefit amounts that are actuarially equivalent to the age-65 SLA participants could have selected when compared to ECFs generated based on reasonable, current actuarial assumptions.   The chart below compares the Part B ECFs to those generated by the Treasury Assumptions for 2021.

| Age | Part B's ECFs | ECFs Generated By 2021 Treasury Assumptions | Difference |
|-----|---------------|---------------------------------------------|------------|
| 55  | .38           | .55                                         | 43.8%      |
| 56  | .42           | .59                                         | 39.6%      |
| 57  | .46           | .63                                         | 36.3%      |
| 58  | .50           | .67                                         | 33.8%      |
| 59  | .55           | .71                                         | 29.4%      |
| 60  | .60           | .76                                         | 26%        |

| 61 | .66 | .80 | 21.4% |
|----|-----|-----|-------|
| 62 | .73 | .85 | 16.2% |
| 63 | .81 | .90 | 10.7% |
| 64 | .90 | .95 | 5.3%  |

68.     During each year of the Class Period, the ECFs generated using either the reasonable Treasury Assumptions or high-grade corporate bond index rates were substantially more favorable for participants than the ECFs Defendants used to calculate Part B benefits. The Part B ECFs result in participants that retire before age 65 receiving benefits that are substantially lower — in each form of annuity benefits that the Plans offer — than if Defendants used reasonable interest and mortality rates as required by ERISA. Defendants' application of these unreasonably low ECFs to calculate participants' early Part B benefits violates ERISA's actuarial equivalence requirement and results in monthly payments that are lower than participants should receive.

**B.    The Part B ECFs Are Unreasonable Compared to Those in Other Parts of the Plans**

69.     The Part B ECFs are substantially worse for participants and are unreasonable compared to the ECFs in other parts of the Plans.  For example, participants' benefits under the Firstar Plan are reduced by only 1/180 for each month between ages 60 and 65, or 6 and 2/3% each year.  Between ages 55 and 60, they are reduced by only 1/360 for each month, or 3 and 1/3% per year.

70.     The Part A ECFs, under the Firstar Plan, Part B ECFs, and the difference between the two are shown below:

| Age | Part A ECF (Firstar Plan) | Part B ECF | Difference |
|-----|---------------------------|------------|------------|
| 55  | .5                        | .38        | 24%        |
| 56  | .534                      | .42        | 21%        |
| 57  | .567                      | .46        | 19%        |
| 58  | .60                       | .50        | 17%        |
| 59  | .633                      | .55        | 13%        |
| 60  | .666                      | .60        | 10%        |
| 61  | .733                      | .66        | 10%        |
| 62  | .80                       | .73        | 9%         |
| 63  | .866                      | .81        | 6%         |
| 64  | .933                      | .90        | 3%         |

71.     The Part B ECFs are also substantially worse for participants and are unreasonable compared to the ECFs applied to participants with pre-2002 CB Plan or Mercantile Plan benefits under Part A or Part C.  Both use the Treasury Assumptions, which, as shown in the chart in ¶ 67, above, generate ECFs that are substantially higher for participants.

72.     The Plans also permit participants in the U.S. Bancorp 401(k) Savings Plan ("401K Plan") to roll over all or part of their 401K Plan accounts into the Plans in order to

purchase an annuity.  *See id.* at § 6.5.  When 401K Plan participants do so, the amount they transfer is converted to an annuity using the Treasury Assumptions.  *See id*. at § 6.5.

**IV. Plaintiffs' Benefits Are Not Actuarially Equivalent to Their Age-65 SLAs**

73.    Plaintiff Adams began receiving her pension benefits in August 2021, when she was age 63 and 6 months.  She is receiving Part B benefits as an SLA that pays her $844.95 per month.  Her benefit was calculated using an ECF of 0.855.  In other words, her SLA at BCD is 85.5% of her age-65 SLA.

74.    Plaintiff Pettenger began receiving her pension benefits in April 2020, when she was age 64. She is receiving Part B benefits as an SLA that pays her $905.93 a month. Her benefit was calculated using an ECF of 0.900. In other words, her Part B SLA is 90% of her age-65 SLA.  Plaintiff Pettenger is also receiving Part A Mercantile benefits as an SLA of $97.40 per month.  However, as discussed, Part A benefits are reduced using ECFs based on the applicable Treasury Assumptions at BCD, which are reasonable. Therefore, the harm to Plaintiff Pettenger stems entirely from the excessive reductions to her Part B benefits.

75.    Plaintiff Snead began receiving her pension benefits in July 2019, when she was age 55 and 2 months. She is receiving her Part B benefits as a 100% JSA that pays her $176.35 a month. To calculate her 100% JSA, Defendants first reduced her SLA at NRD ($530.33) using an ECF of 0.386, which produced an SLA at BCD of $205.06. Then, Defendants reduced her early retirement SLA at BCD ($205.06) by the Plan's 100% JSA reduction factor (0.86), resulting in a monthly benefit of $176.35. Plaintiff Snead is also receiving Part A Mercantile benefits as a 100% JSA of $100.00 per month.   Again, her

Part A benefits are reduced using ECFs based on the applicable Treasury Assumptions and, therefore, the harm to Plaintiff Snead stems entirely from her Part B benefits.

76.     If Defendants had applied ECFs based on current, reasonable actuarial assumptions, such as the applicable Treasury Assumptions, Plaintiffs' monthly benefit payments would be higher throughout their retirements.  Had the Plans applied an ECF based on the Treasury Assumptions, Plaintiff Adams' monthly benefit would be $911.30, or $66.35 per month higher than what she is currently receiving. Plaintiff Pettenger's monthly benefit would be $946.51, or $40.58 per month higher than what she is currently receiving. Plaintiff Snead's 100% JSA at BCD would be $222.99, or $46.64 per month higher than the benefit she is currently receiving.

77.     Plaintiffs are, and have been, receiving benefits that are not actuarially equivalent to their age-65 SLAs and are materially less than they should be, in violation of ERISA §§ 204(c)(3) and 203(a).  Plaintiff Adams' past damages (as of January 1, 2022) are $331.75, and her future damages are $12,901.80, for a total of $13,233.55. Plaintiff Pettenger's damages (as of January 1, 2022) are $852.18, and her future damages are $7,494.29, for a total of $8,346.47. Plaintiff Snead's damages (as of January 1, 2022) are $1,399.20, and her future damages are $11,921.48, for a total of $13,320.68.

## CLASS ACTION ALLEGATIONS

78.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the class (the "Class") defined as:

> All participants in the Plans, or their beneficiaries, (1) whose BCD is on or after March 1, 2016; (2) who received Part B annuity benefits that were reduced by the Part B ECFs; and (3)

24

where the actuarial present value of their annuity benefit as of BCD was less than the actuarial present value of their age-65 SLA using the applicable Treasury Assumptions as of each participant's BCD. Excluded from the Class are Defendants and any individuals who are subsequently to be determined to be fiduciaries of the Plans.

79.     The members of the Class are so numerous that joinder of all members is impractical.  Upon information and belief, the Class includes over a thousand participants and their beneficiaries.  For the year ending December 31, 2019, there were over 60,000 active participants in the Plan and more than 21,000 participants who are retired and receiving benefits.  Effective January 1, 2020, U.S. Bank then transferred the liabilities of 23,610 retired participants in the Plan to the Legacy Plan.

80.     Plaintiffs' claims are typical of the claims of the members of the Class because they arise out of the same policies and practices as alleged herein, and all members of the Class similarly had the amount of their Part B benefits reduced by the Plan's ECFs.

81.     There are questions of law and fact common to the Class and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

A.     Whether the ECFs applicable to the Part B benefits cause participants to receive early retirement benefits that are less than the actuarial equivalent of the age-65 SLA;

B.     Which actuarial assumptions would provide a reasonable ECF to apply to Part B benefits to satisfy the actuarial equivalence requirement of ERISA § 204(c)(3);

C. Whether Class members should receive higher monthly benefit payments; and

D. Whether Plaintiffs and Class members should receive additional payments to compensate for past benefit payments that did not satisfy ERISA's actuarial equivalence requirement.

82. Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class actions. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

83. This action may be properly certified under either subsection of Federal Rule of Civil Procedure 23(b)(1). Class action status is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

84. In the alternative, certification under Rule 23(b)(2) is warranted because Defendants have acted or refused to act on grounds generally applicable to the Class,

thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

85.    In the alternative, certification under Rule 23(b)(3) is warranted because the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

**FIRST CLAIM FOR RELIEF**
**Declaratory and Equitable Relief**
**(ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3))**

86.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint.

87.    The Plans improperly reduce Part B benefits by using unreasonable ECFs. Throughout the Class Period, the early retirement benefits resulting from the Part B ECFs are less than the actuarial equivalent of the participant's age-65 SLA in violation of ERISA § 204(c)(3) and 203(a), 29 U.S.C. § 1054(c)(3) and 29 U.S.C. 1053(a).

88.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

89.    Pursuant to this provision, 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure 57, Plaintiffs seek declaratory relief, determining that the ECFs applied to

the Part B benefits do not provide an equivalent benefit to that which they would receive at age 65 and are inconsistent with reasonable actuarial assumptions.

90.     Plaintiffs further seek orders from the Court providing a full range of equitable relief, including but not limited to:

(a)     re-calculation and correction of Part B benefits under the Plans previously paid using the Part B ECFs;

(b)     an "accounting" of all prior Part B benefits and payments under the Plans;

(c)     a surcharge;

(d)     disgorgement of amounts wrongfully withheld;

(e)     disgorgement of profits earned on amounts wrongfully withheld;

(f)     a constructive trust;

(g)     an equitable lien;

(h)     an injunction against further violations; and

(i)     other relief the Court deems just and proper.

## SECOND CLAIM FOR RELIEF
### Breach of Fiduciary Duty
**(ERISA §§ 1104 and 502(a)(3), 29 U.S.C. §§ 1104 and 1132(a)(3))**

90.     Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint.

91.     The BAC and each of its members are named fiduciaries of the Plans and their participants and beneficiaries.

92.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). This is a functional test. Neither "named fiduciary" status nor formal delegation is required for a finding of fiduciary status, and contractual agreements cannot override finding fiduciary status when the statutory test is met.

93.     The BAC and each of its members are fiduciaries for the Plans and their participants and beneficiaries because they exercised discretionary authority or discretionary control respecting the management of such plan or exercised any authority or control respecting the management or disposition of Plans' assets.  In particular, they had authority or control over the amount and payment of benefits paid when a participant with vested Part B benefits retired before age 65.

94.     ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), provides that a fiduciary shall discharge its duties with respect to a plan in accordance with the documents and instruments governing the plan insofar as the plan is consistent with ERISA.

95.     The Plans are not consistent with ERISA because the Plans' Part B ECFs result in a payment of benefits that is less than the actuarial equivalent of the age-65 SLA, in violation of ERISA §§ 204(c)(3) and 203(a), 29 U.S.C. § 1054(c)(3) and 29 U.S.C. § 1053(a).

96.     In following the terms of the Plans that violated ERISA, the BAC and its members exercised their fiduciary duties and control over the Plans and their assets.

97.     In following the terms of the Plans in violation of ERISA, the BAC and its members breached their fiduciary duties.

98.     ERISA imposes on fiduciaries that appoint other fiduciaries the duty to monitor the actions of those appointed fiduciaries to ensure compliance with ERISA.  U.S. Bank appointed the BAC and in allowing it to pay unreasonably low benefits in violation of ERISA, U.S. Bank breached its fiduciary duties to supervise and monitor the BAC.

99.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

100.     Pursuant to this provision, 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure 57, Plaintiffs seek declaratory relief, determining that the ECFs applicable to the Part B benefits violate ERISA because they do not provide an actuarially equivalent benefit to what a participant would receive at normal retirement age under the Plans.

101.    Plaintiffs further seek orders from the Court providing a full range of equitable relief, including but not limited to:

(a)    re-calculation and correction of Part B benefits previously paid after the Plans' Part B ECFs were applied;

(b)    an "accounting" of all prior Part B benefits and payments;

(c)    a surcharge;

(d)    disgorgement of amounts wrongfully withheld;

(e)    disgorgement of profits earned on amounts wrongfully withheld;

(f)    a constructive trust;

(g)    an equitable lien;

(h)    an injunction against further violations; and

(i)    other relief the Court deems just and proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that judgment be entered against Defendants on all claims and request that the Court award the following relief:

A.    Certifying this action as a class pursuant to Federal Rule of Civil Procedure 23;

B.    Declaring that the Plans fail to properly calculate and pay retirement benefits for participants with vested Part B benefits who retire before age 65;

C.    Ordering Defendants to correct and recalculate Part B benefits that have been paid;

D.      Ordering Defendants to provide an "accounting" of all prior payments of Part B benefits under the Plans to determine the proper, actuarially equivalent amounts that should have been paid;

E.      Ordering U.S. Bank to pay all benefits improperly withheld, including under the theories of surcharge and disgorgement;

F.      Ordering U.S. Bank to disgorge any profits earned on amounts improperly withheld;

G.      Imposition of a constructive trust;

H.      Imposition of an equitable lien;

I.      Ordering Defendants to pay future Part B benefits in accordance with ERISA's actuarial equivalence requirements;

J.      Awarding, declaring, or otherwise providing Plaintiffs and the Class with all the relief available under ERISA § 502(a), 29 U.S.C. § 1132(a), or any other applicable law, that the Court deems proper, and such appropriate equitable relief as the Court may order, including an accounting, surcharge, disgorgement of profits, equitable lien, constructive trust, or other remedy;

K.      Awarding to Plaintiffs' counsel attorneys' fees and expenses as provided by the common fund doctrine, ERISA § 502(g), 29 U.S.C. § 1132(g), and/or other applicable doctrine; and

L.      Any other relief the Court determines is just and proper.

Dated:  February 28, 2022                    Respectfully submitted,

                                             */s/Daniel E. Gustafson*
                                             Daniel E. Gustafson (#202241)
                                             Amanda M. Williams (#341691)
                                             **GUSTAFSON GLUEK LLP**
                                             Canadian Pacific Plaza
                                             120 South Sixth Street, Suite 2600
                                             Minneapolis, MN 55402
                                             Telephone: 612-333-8844
                                             Facsimile: 612-339-6622
                                             Email:  dgustafson@gustafsongluek.com
                                             Email:  awilliams@gustafsongluek.com

                                             **IZARD, KINDALL & RAABE LLP**
                                             Robert A. Izard (*pro hac vice* forthcoming)
                                             Douglas Needham (*pro hac vice* forthcoming)
                                             Oren Faircloth (*pro hac vice* forthcoming)
                                             29 South Main Street, Suite 305
                                             West Hartford, CT 06107
                                             Telephone: 860-493-6292
                                             Facsimile: 860-493-6290
                                             Email:  rizard@ikrlaw.com
                                             Email:  dneedham@ikrlaw.com
                                             Email:  ofaircloth@ikrlaw.com

                                             **BAILEY & GLASSER LLP**
                                             Gregory Y. Porter (*pro hac vice* forthcoming)
                                             Mark G. Boyko (*pro hac vice* forthcoming)
                                             Laura E. Babiak (*pro hac vice* forthcoming)
                                             1054 31st Street, NW, Suite 230
                                             Washington, DC 20007
                                             Telephone: (202) 463-2101
                                             Facsimile: (202) 463-2103
                                             Email:  gporter@baileyglasser.com
                                             Email:  mboyko@baileyglasser.com
                                             Email:  lbabiak@baileyglasser.com

                                             ***Attorneys for Plaintiffs***