## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| SUE ANN ADAMS, PATRICIA J. PETTENGER, and MARLA K. SNEAD, on behalf of themselves and all others similarly situated, | Case No. 22-CV-509 (NEB/LIB) |
| Plaintiffs, | |
| v. | ORDER ON MOTION TO DISMISS AND STRIKE CLASS ALLEGATIONS |
| U.S. BANCORP, the BENEFITS ADMINISTRATION COMMITTEE, and JOHN/JANE DOES 1-5, | |
| Defendants. | |

A few years back, former employees of U.S. Bancorp sued their employer with materially identical claims to those alleged here. *Smith v. U.S. Bancorp*, No. 18-CV-3405 (PAM/KMM), 2019 WL 2644204 (D. Minn. June 27, 2019). The employees asserted that U.S. Bancorp decreased the value of their pensions in violation of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"). *Id.* at *1. The court denied U.S. Bancorp's motion to dismiss, concluding that it was plausible that the company violated 29 U.S.C. Sections 1054(c)(3) and 1053(a) of ERISA. *Id.* at *3–4. Later, however, the court declined to certify the plaintiffs' class, leading them to voluntarily

dismiss their claims with prejudice. *Thorne v. U.S. Bancorp*, No. 18-CV-3405 (PAM/KMM), 2021 WL 1977126, at *4 (D. Minn. May 18, 2021).[1]

Attempting a do-over, a different group of former U.S. Bancorp employees—Sue Adams, Patricia Pettenger, and Marla Snead ("Plaintiffs")—bring this putative class action. Plaintiffs attempt to dodge the class certification issues that plagued their peers in *Smith*. But their underlying claims largely remain the same. Plaintiffs retired before turning sixty-five, so their monthly pension benefits needed to be adjusted downward to account for a longer benefits withdrawal period. (ECF No. 1 ("Compl.") ¶¶ 2–4.) They allege that the discount and mortality rate assumptions used to make that adjustment led to an improper overall reduction of their total benefits as compared to what they would have received had they retired at sixty-five. (*Id.* ¶¶ 5–6, 66–68.) Plaintiffs therefore claim that U.S. Bancorp, the Benefits Administration Committee, and the individual members of that committee ("Defendants") violated Sections 1054(c)(3) and 1053(a). (*Id.* ¶ 6.)

Defendants move to dismiss, arguing that their methodology did not violate Sections 1054(c)(3) or 1053(a). In the same filing, they also ask the Court to strike Plaintiffs' class allegations, asserting that their revised class definition is an impermissible fail-safe class. The Court denies the motion.

---

[1] After the stipulated dismissal of Janet Smith, the case was renamed *Thorne v. U.S. Bancorp*. No. 18-CV-3405 (PAM/KMM), ECF No. 115 at 1 (D. Minn. Nov. 3, 2020).

**BACKGROUND**

The Court presents the facts in the light most favorable to the non-moving party. Plaintiffs are former employees of U.S. Bancorp. (Compl. ¶¶ 13–15.) They each accrued "Part B" retirement benefits under the U.S. Bank Pension Plan ("Plan"). (*Id.* ¶ 2, 13–15.) The Plan is a defined-benefit retirement program that provides, in its simplest form, an annuity consisting of monthly payments from age sixty-five (the typical retirement age) until a retiree's passing. (*Id.* ¶¶ 1, 4, 26.) Plaintiffs worked for at least five years at U.S. Bancorp and retired "early"—before turning sixty-five. (*Id.* ¶¶ 4, 13–15.) When an eligible employee retires early, the Plan requires a decrease in the employee's monthly pension amount to account for more years of payments. (*Id.* ¶ 4.) That decrease is necessary to make the early retiree's total retirement benefits "actuarial[ly] equivalent" to what they would have received had they retired at the normal retirement age. (*Id.* ¶¶ 4–5, 19.) It is the phrase "actuarial equivalence"—and the calculations used to achieve it—that present the conundrum here.

Plaintiffs allege that actuarial-equivalence calculations require a comparison of the present value of the total amount of benefits to be received under two forms of benefits to make sure they are equal. (*Id.* ¶¶ 22, 44.) Calculating the present value of two benefit forms requires two assumptions: a discount (or interest) rate and a mortality table.[2] (*Id.* ¶ 45.) Plaintiffs allege that the standards of the actuarial profession require

_____

[2] The Court uses the terms "discount" and "interest" rate interchangeably.

that those assumptions be reasonable. (*Id.* ¶¶ 53, 59.) Indeed, the Actuarial Standards Board's standards of practice expressly instruct that discount-rate assumptions should be "reasonable," reflecting "historical and current economic data that is relevant as of the measurement date." (*Id.* ¶ 53 (citation omitted).) Likewise, mortality assumptions should take "into account historical and current demographic data that is relevant as of the measurement date" and reflect "the actuary's estimate of future experience." (*Id.* ¶ 59 (citation omitted).)

The Plan provides its own specific method to calculate "actuarial equivalent" values without any mention of reasonableness. (*Id.* ¶ 4.) It uses Plan-defined early commencement factors ("ECFs") to reduce benefits by a set percentage. (*Id.*) For example, if a Plan participant retires early at age fifty-five, the Plan applies an 0.38 ECF, which would turn a hypothetical $1,000 monthly pension into $380. (*Id.* ¶ 34.) The Plan does not specify the mortality and discount-rate assumptions underlying its ECF values (*Id.* ¶ 66.) But the ECFs that apply to Plaintiffs have not changed since 2002, and life expectancies and discount rates have changed "substantial[ly]" since then. (*Id.*)

Plaintiffs therefore contend that the ECF multipliers are "unreasonable, excessive, and punitive." (*Id.* ¶ 5.) They allege that the original assumptions on which they are based were "unreasonable and outdated" in 2002, let alone today. (*Id.*) To compare, Plaintiffs reference the actuarial assumptions prepared by the U.S. Department of the Treasury. (*Id.* ¶¶ 5, 67.) Plaintiffs assert that for some Plan

participants, benefits were reduced roughly forty percent more than they would have been had Defendants used the Treasury's discount and mortality rate figures. (*Id.* ¶ 5.) The result, according to Plaintiffs, is that they are receiving less in benefits than they are entitled to each month. (*Id.* ¶ 6.)

Plaintiffs bring this putative class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and others whose early-retirement benefits were reduced by the Plan's ECFs. (*Id.* ¶ 78.) They seek declaratory and equitable relief under 29 U.S.C. Section 1132(a)(3), which authorizes civil actions to redress ERISA violations. (*Id.* ¶ 88.) Plaintiffs allege two such violations: first, that the Plan's ECF methodology resulted in early-retirement benefits that are not "actuarial[ly] equivalent" to what they would have received had they retired at sixty-five, in violation of 29 U.S.C. Section 1054(c)(3); and second, that the Plan's methodology required them to forfeit benefits in violation of 29 U.S.C. Section 1053(a). (*Id.* ¶ 87.) They bring a claim for breach of fiduciary duty based on the violation of those provisions as well. (*Id.* ¶ 95.)

Defendants move to dismiss. (ECF No. 21.) As to the first claim, they argue that Section 1054(c)(3) does not require pension plans to calculate early-retirement benefits with "reasonable" assumptions—and that the Plan's definition of the ECFs controls. (ECF No. 23 at 3–4.) As to the second claim, they assert that Section 1053(a)'s anti-forfeiture provision does not apply to early retirees. (*Id.* at 4–5.) Finally, Defendants

move to strike Plaintiffs' class allegations, arguing that the putative class definition is an impermissible fail-safe class. (*Id.* at 5.)

ANALYSIS

The Court begins by addressing Defendants' motion to dismiss Plaintiffs' ERISA claims, and then turns to Defendants' motion to strike Plaintiffs' class allegations.

## I.     Defendants' Motion to Dismiss

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks and citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The Court must "accept as true" all plausible factual allegations. *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "Though matters outside the pleading may not be considered in deciding a Rule 12 motion to dismiss, documents necessarily embraced by the complaint are not matters outside the pleading." *Ashanti v. City of Golden Valley*, 666 F.3d 1148, 1151 (8th Cir. 2012) (citation omitted).

As noted above, Plaintiffs allege two ERISA violations. They contend that Defendants reduced their benefits to less than what they would have received had they

retired at age sixty-five, causing them to forfeit part of their pension in violation of Sections 1054(c)(3) and 1053(a). (Compl. ¶ 6.) The Complaint "necessarily embrace[s]" the Plan, so the Court will consider the Plan when addressing the motion to dismiss the alleged ERISA violations. *Ashanti*, 666 F.3d at 1151.

### A.    Section 1054(c)(3)

Section 1054(c)(3) addresses what a plan owes its participants if it allows for early retirement. The statute provides:

> [I]n the case of any defined benefit plan, if an employee's accrued benefit is to be determined as an amount other than an annual benefit commencing at normal retirement age, or if the accrued benefit derived from contributions made by an employee is to be determined with respect to a benefit other than an annual benefit in the form of a single life annuity (without ancillary benefits) commencing at normal retirement age, the . . . benefit . . . shall be the *actuarial equivalent* [of an annual benefit commencing at normal retirement age].

29 U.S.C. § 1054(c)(3) (emphasis added). Put another way, Section 1054(c)(3) requires that "the accrued benefit under a defined benefit plan must be valued in terms of the annuity that it will yield at normal retirement age." *Esden v. Bank of Bos.*, 229 F.3d 154, 163 (2d Cir. 2000). "[I]f the benefit is paid at any other time (*e.g.*, on termination rather than retirement) or in any other form (*e.g.*, a lump-sum distribution, instead of annuity) it must be worth at least as much as that annuity." *Id.*

The parties agree that Defendants followed the Plan; they disagree whether the Plan violates ERISA. The issue, therefore, is what Section 1054(c)(3) means by "actuarial[ly] equivalent." If the term requires the use of discount-rate and mortality

assumptions that would result in a larger pension amount for early retirees than the Plan's methodology, Plaintiffs state a plausible claim for relief. If not, and the Plan alone controls, then Defendants' motion to dismiss the Section 1054(c)(3) claim should be granted.

Congress has not defined "actuarial equivalent." *Stephens v. U.S. Airways Grp.*, 644 F.3d 437, 440 (D.C. Cir. 2011). Many circuit courts have addressed the term's meaning, although in cases involving lump-sum or cash-balance distributions rather than early-retirement annuities. *See, e.g., id.* (discussing the meaning of "actuarial equivalent" when converting an annuity into a lump-sum distribution).[3] In the last few years, numerous district courts have examined the term as well, but few in the early-retirement context.[4] And those that have addressed the issue arrived at different answers. The Court first surveys the early-retirement caselaw, then turns to its analysis.

---

[3] *See also Esden*, 229 F.3d at 164 (same with a cash-balance plan); *Miller v. Xerox Corp. Ret. Income Guarantee Plan*, 464 F.3d 871, 874–75 (9th Cir. 2006) (hybrid plan); *Berger v. Xerox Corp. Ret. Income Guarantee Plan*, 338 F.3d 755, 759 (7th Cir. 2003) (cash-balance plan); *McDaniel v. Chevron Corp.*, 203 F.3d 1099, 1104 (9th Cir. 2000) (cash-balance plan).

[4] Plaintiffs rely heavily on many of these district-court cases in their opposition papers. (ECF No. 33 at 6–16.) But most are unpersuasive here. The cases involved actuarial calculations outside the early-retirement context with different regulatory schemes, and at times the defendants admitted that Section 1054(c)(3) required reasonable assumptions (and Defendants make no such concession here). *See, e.g., Masten v. Metro. Life Ins.*, 543 F. Supp. 3d 25, 29, 34–35 (S.D.N.Y. 2021) (involving a joint-and-survivor annuity and the defendant's admission that § 1054(c)(3) imposes a reasonableness requirement*); Cruz v. Raytheon Co.*, 435 F. Supp. 3d 350, 352 (D. Mass. 2020) (involving a joint-and-survivor annuity); *Smith v. Rockwell Automation, Inc.*, 438 F. Supp. 3d 912, 914–15, 919–20 (E.D. Wis. 2020) (involving a ten-year certain-and-life annuity, and noting

1.    *The Recent Wave of Early-Retirement ERISA Litigation*

In *Smith*, the predecessor to this case, a court in this district denied a similar motion to dismiss because Section 1054(c)(3) requires plans to discount benefits using "applicable" interest rates and life expectancies set by the Internal Revenue Service. 2019 WL 2644204, at *3 (citing the Tax Code and Treasury regulations). As noted above, *Smith* involved nearly identical allegations to those brought here. *See id.* at *1. The court reasoned that if plans were free to use any assumptions when converting early-retirement annuities, it would "eviscerate the protections provided by ERISA's requirement of 'actuarial equivalence.'" *Id.* at *3 (citing *Esden*, 229 F.3d at 164). For example, plans could apply extreme ECFs, such as a 99% benefit reduction if a participant retires one year early. *Id.* The court determined that Section 1054(c)(3) does not "leave a plan free to choose its own methodology for determining the actuarial equivalent" value. *Id.* (citing *Esden*, 229 F.3d at 164).

The court in *Smith* then defined "actuarial equivalent." *Id.* It reasoned that the phrase is a "term of art," which Congress intended to give "its established meaning." *Id.* (citing *Stephens*, 644 F.3d at 440). The established meaning of "actuarial equivalent," the

_____

that the defendants admitted that "actuarial equivalence" requires at least reasonable assumptions at the time of the plan's creation); *Torres v. Am. Airlines, Inc.*, 416 F. Supp. 3d 640, 643, 647–48 (N.D. Tex. 2019) (reasoning that "actuarial equivalence" requires "reasonable" assumptions but recognizing that the defendant did not contest that interpretation); *Dooley v. Am. Airlines, Inc.*, No. 81 C 6770, 1993 WL 460849, at *10 (N.D. Ill. Nov. 4, 1993) (omitting a discussion of the regulatory scheme in a case involving a lump-sum distribution).

court determined, is "when the[] present values [of two modes of payment] are equal under a given set of actuarial assumptions." *Id.* (citing *Stephens*, 644 F.3d at 440). As for calculating present values, the court looked to Treasury regulations for guidance. *Id.* It reasoned that "any distribution of any accrued benefit from a defined benefit plan" must discount the accrued benefit at the "applicable interest rate" specified by the Internal Revenue Service. *Id.* (first citing 26 C.F.R. § 1.411(a)-11(d); and then citing 26 U.S.C. § 417(e)(3)(A)). The court stated that mortality data factors into the calculation as well. *Id.* It therefore denied the motion to dismiss, concluding that the plaintiffs had alleged that the ECFs were "not calculated in accordance with these requirements." *Id.*

Other courts have interpreted Section 1054(c)(3) itself, not Treasury regulations, to require "reasonable" actuarial assumptions.[5] For example, in *Urlaub v. CITGO Petroleum Corp.*, the court emphasized that "it cannot possibly be the case that ERISA's actuarial equivalence requirements allow the use of unreasonable mortality assumptions." No. 21 C 4133, 2022 WL 523129, *6 (D. Ill. Feb. 22, 2022). If it did, the court reasoned, "the actuarial equivalence requirement would be rendered meaningless." *Id.* The court turned to the dictionary definition of "equivalent," which means "equal in force, amount, or value." *Id.* (citing *Equivalent*, MERRIAM-WEBSTER,

---

[5] As discussed, numerous courts have interpreted Section 1054(c)(3) to require reasonable actuarial assumptions outside the early-retirement context. Treasury regulations imposing reasonableness standards apply in many of those instances, perhaps leading defendants to concede a reasonableness requirement. *See supra* note 4 (collecting cases).

https://www.merriam-webster.com/dictionary/equivalent (last visited February 9, 2022)). It concluded that "[o]nly accurate and reasonable actuarial assumptions can convert benefits from one form to another in a way that results in equal value between the two."[6] *Id.*

Complicating the landscape is a recent decision from the District of Massachusetts, in which the court disagreed sharply with the analysis in *Smith* and *Urlaub*. In *Belknap v. Partners Healthcare System, Inc.*, the court granted summary judgment to the employer. -- F. Supp. 3d --, No. 19-11437-FDS, 2022 WL 658653, at *13 (D. Mass. Mar. 4, 2022). It concluded that Section 1054(c)(3) does not require any discount-rate or mortality assumptions beyond a pension plan's stated methodology to calculate "actuarial[ly] equivalent" values.

Looking first to the statute's plain language, the court in *Belknap* observed that Section 1054(c)(3) omits the term "reasonableness." *Id.* at *7. It treated that omission as deliberate. *Id.* The court then addressed the meaning of "actuarial equivalent," including whether the term itself requires reasonable assumptions. Starting with the Treasury regulations, the court determined that they were all inapplicable, because they apply in the lump-sum distribution context, not the Section 1054(c)(3) annuity context.

---

[6] The Court recognizes that *Urlaub* involved the conversion of a single-life annuity into a joint-and-survivor annuity, unlike here, but the court's reasoning focused on Section 1054(c)(3)'s text, rather than the Treasury regulations. 2022 WL 523129, at *6–7. The Court therefore considers *Urlaub* to be sufficiently analogous.

*Id.* at *8–9 & n.5. The court distinguished *Smith* in part because it relied on those regulations and therefore mistook lump-sum benefits for annuities. *Id.* at *9 & nn.5–6.

As for *Urlaub*, the *Belknap* court rejected the use of the dictionary definition of "equivalent." *Id.* at *10. It reasoned that "equivalent" is modified by "actuarial," meaning that actuarial judgment is required. *Id.* at *10 n.7. The court recognized that judgment may be needed when selecting actuarial assumptions, but it stressed that "[w]hat is at issue here is what 'actuarial equivalent' means in terms of calculating benefits as provided within a defined benefit plan," not the initial selection of the assumptions. *Id.* at *10 n.7.

The *Belknap* court also determined that to the extent "actuarial equivalence" is a term of art, it does not "necessarily require[] or impl[y] 'reasonable' actuarial assumptions." *Id.* at *10. It again emphasized that "the selection of plan terms is not what is at issue; rather, it is the calculation of individual benefits." *Id.* With that narrow framing, the court noted that "both of plaintiff's experts unambiguously testified that if a plan defines 'actuarial equivalence,' the actuary should use the plan's actuarial assumptions to calculate a participant's benefits." *Id.* It therefore concluded that "it appears that it is industry practice to refer to the plan documents to determine the actuarial assumptions used to calculate an actuarially equivalent benefit," even if they are unreasonable. *Id.* at *11.

Lastly, although the *Belknap* court ultimately granted summary judgment to the defendants, it notably denied relief at the motion-to-dismiss stage. No. 19-11437-FDS, 2020 WL 4506162, at *1 (D. Mass. Aug. 5, 2020). As at summary judgment, the court first determined that Section 1054(c)(3)'s text does not impose a reasonableness requirement. *Id.* at *2. But "there [was] no clear answer, at least at [the motion-to-dismiss stage], as to what [was] necessary for two retirement benefit forms to be 'actuarial equivalent[s]' as required by [Section] 1054(c)(3)." *Id.* at *4. The court therefore decided that it could not "resolve the issue, on th[e] record, on a motion to dismiss," noting that "[i]t may be that expert testimony on the topic is required to resolve the issue." *Id.*

2.    *Analysis*

To determine the meaning of "actuarial[ly] equivalent," this Court begins with ERISA's text. As the *Belknap* court reasoned, Section 1054(c)(3) omits the term "reasonableness." 2022 WL 658653, at *7. And that omission must be given meaning. *Great-W. Life & Annuity Ins. v. Knudson*, 534 U.S. 204, 209 (2002) (noting "that ERISA's carefully crafted and detailed enforcement scheme provides strong evidence that Congress did not intend to authorize other remedies that it simply forgot to incorporate expressly" (cleaned up, citation omitted)). But the issue here is not whether the Plan's terms are "reasonable"—it is whether they are "actuarial[ly] equivalent."

"[A]ctuarial equivalent" is "term of art." *Stephens*, 644 F.3d at 440. The Court "assume[s] that when a statute uses such a term, Congress intended it to have its

13

established meaning." *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 342 (1991); *see also In re Geiger*, 113 F.3d 848, 852 (8th Cir. 1997) ("We presume that when Congress uses a word that has a fixed, technical meaning, it has used it as a term of art."). If "Congress has used technical words or terms of art, it is proper to explain them by reference to the art or science to which they are appropriate." *Corning Glass Works v. Brennan*, 417 U.S. 188, 201 (1974) (cleaned up, citations omitted). And so, it makes sense that when the "appropriate methodology" for calculating an actuarially-equivalent value "is not apparent from the face of the definition of actuarial equivalence, nor from the statute or regulations as in effect," courts look "to practice within the field of actuarial science." *Pizza Pro Equip. Leasing v. Comm'r*, 147 T.C. 394, 412 (2016), *aff'd*, 719 F. App'x 540 (8th Cir. 2018);[7] *see also Belknap*, 2020 WL 4506162, at *4 (noting that "[i]t may be that expert testimony" about "how actuaries themselves would interpret" actuarial equivalence "is required to resolve the issue").

*Actuarial equivalence requires a present-value calculation.* Important to the interpretation of actuarial equivalence is its relation to present value. The D.C. Circuit instructs that within the actuarial field, "actuarial equivalen[ce]" is understood to

---

[7] *Pizza Pro* did not involve Section 1054(c)(3). Rather, the tax court interpreted a prior version of 26 U.S.C. Section 415(b)(2)(C), which limited plans' annual benefits. 719 F. App'x at 541. The statute used the term "equivalent," and the applicable Treasury regulation used the term "actuarial equivalent." *Id.* As here, neither the statute nor the regulation defined actuarial equivalence, leaving the tax court to interpret its meaning. *Id.* The Court recognizes that the tax court was interpreting a different provision in *Pizza Pro*, but the methodology is still persuasive.

require a present-value calculation. *Stephens*, 644 F.3d at 440. Relying on the Society of Actuary's definition of actuarially-equivalent benefits, the *Stephens* court determined the term's established meaning to be when the present values of "[t]wo modes of payment are . . . are equal under a given set of actuarial assumptions." *Id.* at 440 (emphasis added) (quoting Jeff L. Schwartzmann & Ralph Garfield, *Educ. & Examination Comm. of the Soc'y of Actuaries, Actuarially Equivalent Benefits 1*, EA1-24-91 (1991)); *see also Smith*, 2019 WL 2644204, at *3 (applying the *Stephens* definition).

As for the meaning of "present value," ERISA defines the term as a "value adjusted to reflect anticipated events." 29 U.S.C. § 1002(27). Plaintiffs allege that such adjustments turn on two assumptions—a discount rate and mortality table. (Compl. ¶ 45); *see also Smith*, 2019 WL 2644204, at *3 (looking to discount rates and mortality data in present-value calculations). They also allege that industry practice requires those assumptions to be reasonable. (Compl. ¶¶ 23, 44, 53, 59.)

The Actuarial Standards Board publishes the Actuarial Standards of Practice, which provides guidance to actuaries on selecting discount-rate and mortality assumptions. (*Id.* ¶¶ 53, 59.) For discount rates, the Board instructs that assumptions should be "reasonable," reflecting "historical and current economic data that is relevant as of the measurement date." (*Id.* ¶ 53 (citation omitted).) Likewise, mortality assumptions should take "into account historical and current demographic data that is

relevant as of the measurement date" and reflect "the actuary's estimate of future experience." (*Id.* ¶ 59 (citation omitted).)

*Actuarial equivalence requires reasonableness in other contexts.* The industry practice of selecting reasonable assumptions aligns with numerous Treasury regulations implementing ERISA.[8] None of these regulations applies in the Section 1054(c)(3) early-retirement context specifically. Still, they each accord with Plaintiffs' allegation that the actuarial industry would interpret the term of art that is "actuarial equivalence" to require reasonableness.

First, 26 C.F.R. Section 1.401(a)–11(b)(2), which governs qualified-joint-and-survivor annuities, states that "actuarial equivalen[ce] . . . may be determined[] on the basis of consistently applied reasonable actuarial factors." § 1.401(a)–11(b)(2). The regulation uses the word "may," not "shall." *Id.*; *see Masten*, 543 F. Supp. 3d at 35 (observing that the "regulatory language . . . does not clearly establish whether Treasury intended reasonableness as a mandate or a recommendation"). And Section 1.401 is not enforceable under ERISA, regardless. *See* § 1202(c) (stating that regulations prescribed only under 26 U.S.C. §§ 410(a), 411, and 412 are enforceable under ERISA);

---

[8] Under 29 U.S.C. Section 1202(c), "[r]egulations prescribed by the Secretary of the Treasury under [26 U.S.C. Sections 410(a), 411, and 412]," some of which address present-value calculations, "apply to the . . . standards set forth [in Section 1054(c)]." § 1202(c); *see also McDaniel*, 203 F.3d at 1115 (stating "that rules prescribed under § 411 of the [Internal Revenue Code] apply with equal force to [§ 1054]," and noting that other circuits, the Department of the Treasury, and the Department of Labor agree with that interpretation).

*Belknap*, 2022 WL 658653, at *9 (concluding the same). Still, Section 1.401(a)–11(b)(2) is at minimum consistent with the industry's standards of practice that require reasonable assumptions.

Second, 26 C.F.R. Section 1.411(d)–3 addresses amendments to defined-benefit plans, and it instructs that "actuarial present value[s]" must be "determined using reasonable actuarial assumptions." § 1.411(d)–3(g)(1). The term "actuarial present value" does not appear in Section 1054(c)(3). *Belknap*, 2022 WL 658653, at *8 (reasoning that § 1.411(d)–3(g)(1) is "not relevant" when interpreting § 1054(c)(3) because of the term's omission). Although the regulation's usefulness is therefore limited, its definition of "actuarial present value" is still consistent with industry practice.

Third, several regulations in the lump-sum distribution context impose reasonableness requirements. Different provisions apply to lump-sum distributions. *See* 26 U.S.C. § 417(e); 29 U.S.C. § 1055(g). Generally, the present value of a retiree's annuity to be paid as a lump-sum must "not be less than the present value calculated by using the applicable mortality table and the applicable interest rate," which are assumptions set and regularly updated by the Treasury. § 1055(g)(3)(A)–(B); *see also* 26 C.F.R. § 1.417(e)–1(d) (similar). For benefits under a lump-sum-based formula, optional forms of benefit must be actuarially equivalent with the use of reasonable assumptions. § 1.411(a)(13)–1(b)(3). And when comparing optional forms of benefits to an immediately-commencing qualified-joint-and-survivor annuity, plans must use either

the "applicable" morality table and interest rates, which are "considered reasonable actuarial assumptions," or specify their own "reasonable interest rate and mortality table." § 1.417(a)(3)–1(c)(2)(iv)(A)–(B).

In *Smith*, the court appears to have applied the "applicable" Treasury assumptions under Section 417(e) to the early-retirement annuity context. 2019 WL 2644204, at *3. The court cited 26 C.F.R. Section 1.411(a)–11(d), which states that when "determining the present value of any distribution of any accrued benefit from a defined benefit plan, the plan must take into account specified valuation rules . . . as set forth in [S]ection 417(e)." *Id.* Although regulations under Section 411 are enforceable under ERISA, Section 417(e) limits itself to "[r]estrictions on cash-outs." § 417(e) (boldface omitted). The "applicable" Treasury assumptions therefore apply only to lump-sum distributions. *Belknap*, 2022 WL 658653, at *9 n.5. But as above, Section 1.411(a)–11(d)—and, in turn, Section 417(e)—are at least consistent with the alleged industry practice of using reasonable assumptions.

Fourth, 29 U.S.C. Section 1056(a)(3) details rules for employers when participants satisfy the service-length requirement for early retirement but are terminated *before* reaching the minimum early-retirement age. § 1056(a)(3). In those cases, once the terminated participant reaches minimum early-retirement age, the plan must pay the participant "a benefit not less than the benefit to which he would be entitled at the *normal retirement age*, actuarially reduced under regulations prescribed by the Secretary

of the Treasury." § 1056(a) (emphasis added). When making that actuarial reduction, tax regulations instruct plans to use "reasonable actuarial assumptions." 26 C.F.R. § 1.401(a)–14(c)(2). Granted, this scenario is not what Plaintiffs allege here—Plaintiffs each retired *after* age fifty-five, the minimum age for early retirement at U.S. Bancorp. (Compl. ¶¶ 73–75; ECF No. 24–2 at 15.) But it would be strange for the Commissioner to provide greater protection to participants who were terminated before reaching minimum early-retirement age rather than those who are active.

In sum, although no regulation on its face requires reasonableness in the Section 1054(c)(3) early-retirement context, the Court concludes that the numerous regulations requiring reasonableness support Plaintiffs' allegation that actuaries would interpret "actuarial equivalen[ce]" to require reasonable assumptions.

*A reasonableness requirement is consistent with ERISA's structure and purpose.* The Court is cognizant that it must not read a term into a statute that Congress intentionally left out. As discussed, Section 1054(c)(3) does not include "reasonable," and the Court must give effect to that omission. In *Belknap*, the court contrasted several ERISA provisions that expressly require reasonable assumptions, suggesting that "their existence clearly shows that if Congress had meant to include a reasonableness requirement in [Section] 1054(c)(3), it could have done so." 2022 WL 658653, at *7; *see also* 29 U.S.C. § 1393(a)(1) (requiring employers to compute withdrawal liability using "actuarial assumptions which, in the aggregate are reasonable"); 29 U.S.C.

§ 1085a(c)(3)(A) (stating that plans must use "actuarial assumptions and methods . . . each of which is reasonable" for plan-funding purposes).

But Sections 1393(a)(1) and 1085a(c)(3)(A) do not use a term of art like "actuarial equivalent." Rather, they outline methodologies for calculating certain values—one for an employer's withdrawal liability, the other its funding liability. *See* § 1393(a)(1); § 1085a(c)(3)(A). That is different. Section 1054(c)(3) may not require "reasonableness" in a particular methodology, but it does require "actuarial equivalen[ce]." § 1054(c)(3). And at this stage, it is plausible that experts would interpret that term of art to require reasonable discount rates and mortality tables. *See Belknap*, 2022 WL 658653, at *7 (noting that the omission of reasonableness in Section 1054(c)(3) "does not . . . necessarily resolve the case" because "it is possible that 'actuarial equivalence' has an accepted or ordinary meaning among experts in the field . . . that . . . includes a 'reasonableness' component").

The court in *Belknap*, though, concluded that even if "actuarial equivalent" is a term of art, industry practice still does not "necessarily require or imply reasonable actuarial assumptions." *Id.* at *10 (cleaned up). The court distinguished between *selecting* a plan's assumptions and *calculating* benefits under the plan. *Id.* Experts testified that when selecting rates, they consider the reasonableness of their assumptions. *Id.* But if a plan defined "actuarial equivalence," as Defendants' Plan does here, the experts would use that definition. *Id.* The Court is wary of parsing industry

practice so finely, especially at the motion-to-dismiss stage without the benefit of its own expert testimony. Indeed, the *Belknap* court denied a similar motion to dismiss because it was not "clear, at least on [its] record, whether 'actuarial equivalence' is in fact a term of art, or how actuaries themselves would interpret the term." 2020 WL 4506162, at *4. Perhaps expert testimony will reveal actuarial practices similar to those discovered in *Belknap*. But for now, Plaintiffs have adequately alleged that industry practice requires reasonable assumptions for present values to be "actuarial[ly] equivalent."

As a final note, reasonableness in actuarial-equivalence calculations is also more consistent with ERISA's purpose. "Broadly speaking, some limits on the discretion of plan administrators in the selection of actuarial methodology are necessary to effectuate the protective purposes of ERISA . . . ." *Masten*, 543 F. Supp. 3d at 35. "The alternative interpretation, in which administrators have free reign to fashion the assumptions used to calculate actuarial equivalence, would permit all kinds of mischief inconsistent with that purpose." *Id*. In *Belknap*, the court stressed that its contrary conclusion did not mean that plans have "unfettered discretion" in calculating benefits. 2022 WL 658653, at *11. The Court disagrees. Yes, plans may have to list their assumptions, but under the *Belknap* court's reasoning, there is no legal mechanism to police unreasonable rate selection—even extreme ones, like a 99% discount rate. Accepting Plaintiffs' allegations

about the actuarial industry's standards as true, surely such a severe reduction no longer produces "actuarial[ly] equivalent" present values.

The Court therefore concludes that Plaintiffs have stated a plausible Section 1054(c)(3) claim. They allege that experts in the field would interpret "actuarial equivalen[ce]" to require reasonable assumptions, and that the ECFs used by Defendants are unmoored from prevailing discount rates and mortality tables. (Compl. ¶¶ 5, 53, 59, 66–68.) That is a plausible allegation that Defendants violated Section 1054(c)(3). Again, the Court recognizes that no tax regulation requires reasonable assumptions in the early-retirement context at issue, even if such a requirement would be more consistent with ERISA's structure and purpose. The Court also recognizes that discovery may reveal that the actuarial industry does not interpret "actuarial equivalen[ce]" to require calculating benefits with reasonable rates and mortality figures. But that is an issue best left for a court equipped with well-developed record. For now, accepting Plaintiffs' factual allegations as true, they have stated a plausible claim.

**B.**   *Section 1053(a)*

Defendants next argue that the Complaint does not allege a violation of Section 1053(a), ERISA's anti-forfeiture provision. (ECF No. 23 at 21–22.) The statute provides in relevant part:

**(a) Nonforfeitability requirements**

Each pension plan shall provide that an employee's right to his normal retirement benefit is nonforfeitable upon the attainment of normal retirement age and in addition shall satisfy the requirements of paragraphs (1) and (2) of this subsection.

> (1) [Omitted].

> (2)(A)(i) In the case of a defined benefit plan, a plan satisfies the requirements of this paragraph if it satisfies the requirements of clause (ii) or (iii).

> (ii) A plan satisfies the requirements of this clause if an employee who has completed at least 5 years of service has a nonforfeitable right to 100 percent of the employee's accrued benefit derived from employer contributions.

> (iii) [Omitted].

29 U.S.C. § 1053(a). In other words, defined-benefit plans must satisfy two independent requirements: (1) "minimum vesting standards mandating that each pension plan shall provide that an employee's right to his normal retirement benefit is nonforfeitable upon the attainment of normal retirement age," and (2) for employees who have "completed at least 5 years of service," "nonforfeitable right[s] to 100 percent of the employee's accrued benefit derived from employer contributions." *Laurent v. PricewaterhouseCoopers LLP*, 794 F.3d 272, 274 (2d Cir. 2015) (cleaned up, citations omitted).

Plaintiffs concede that the first requirement does not apply here. (ECF No. 33 at 23 ("Unlike the protections for a participant's 'normal retirement benefit,' the protection in subsection (a)(2) for a participant's accrued benefit is not limited to participants who

are at age 65." (emphasis omitted).) The Court therefore focuses its inquiry on the second requirement: whether Section 1053(a)(2) protects early retirees.

Courts are split on this question. Most have concluded that Section 1053(a)(2)(A)(ii) imposes an anti-forfeitability requirement. In *Masten*, for example, the court determined that the plaintiffs stated a viable anti-forfeiture claim. 543 F. Supp. 3d at 36. It reasoned that Section 1053(a)(2)(A)(ii) "guarantees employees like Plaintiffs, who have completed at least five years of service, 'a nonforfeitable right to 100 percent of the employee's accrued benefit.'" *Id.* (quoting § 1053(a)(2)(A)(ii)). And it concluded that to state such a claim, plaintiffs must "plausibly allege that the actuarial assumptions reduced their benefits as compared to the Plan's default benefit." *Id.*

Similarly, in *DuBuske v. PepsiCo, Inc.*, the court suggested that early retirees may allege Section 1053(a)(2)(A)(ii) violations, but it dismissed the plaintiffs' claims because of a disconnect between their complaint and arguments against dismissal. No. 18 CV 11618 (VB), 2019 WL 4688706, at *4 (S.D.N.Y. Sept. 25, 2019), *vacated on other grounds by* 2019 WL 5864995 (S.D.N.Y. Nov. 8, 2019). The court began with ERISA's definition of "accrued benefit." *Id.* It explained that an "accrued benefit" is "expressed in the form of an annual benefit commencing at normal retirement age." *Id.* (quoting *Laurent*, 794 F.3d at 274); *see also* § 1002(23)(A). "This means that an employee's accrued benefit is the amount she would receive annually as an annuity after she reaches normal retirement age." *DuBuske*, 2019 WL 4688706, at *4 (cleaned up, citation omitted). It "is not the

amount of pension payment a recipient receives by retiring early, it is the amount of pension payment a recipient achieves at normal retirement age." *Id.* (citation omitted).

The court in *DuBuske* suggested that it is possible to allege a Section 1053(a)(2)(A)(ii) anti-forfeitability violation, even though the plaintiffs in its case did not. *Id.* There, the plaintiffs "d[id] not claim defendants ha[d] deprived plaintiffs of the full amount of pension payments they would achieve at normal retirement age," unlike in *Smith. Id.* at *4 & n.4 (observing that in *Smith*, the plaintiffs contended that the factors in dispute resulted in "benefits that are not actuarially equivalent to the retirement benefit they would have received at age 65," so they had properly alleged an anti-forfeitability claim (emphasis and citation omitted)). Rather, the plaintiffs argued that "ERISA elsewhere imposes a separate and additional requirement that the benefits plaintiffs receive be no less than the single life annuity they were offered when they *actually* retired." *Id.* at *4 (cleaned up, citation omitted). The court concluded that Section 1053(a)(2)(A)(ii) "imposes no such requirement."[9] *Id.*

On the other hand, in *Belknap*, the court determined that Section 1053(a)(2)(A)(ii) does not extend nonforfeitability to early retirees. (ECF No. 24-1.) The *Belknap* court

---

[9] Plaintiffs also cite *Urlaub* in support. (ECF No. 33 at 22.) There, the court determined that early retirees may allege Section 1053(a) anti-forfeiture violations. *Urlaub*, 2022 WL 523129, at *7–8. But the court based its conclusion on Section 1053(a)'s first requirement about normal retirement benefits, which Plaintiffs concede does not apply here. *Id.*; (*see* ECF No. 33 at 22–23.) The court did not discuss the second requirement in Section 1053(a)(2) about accrued benefits. *See* 2022 WL 523129, at *7–9.

defined "accrued benefit" the same as in *DuBuske*, noting that it is the amount a plaintiff would receive after she reaches "normal retirement age." *Compare* (*id.* at 9), *with DuBuske*, 2019 WL 4688706, at *4. But unlike in *DuBuske*, the court inferred from that definition that the plaintiff could not allege a Section 1053(a)(2)(A)(ii) violation because he retired early. (ECF No. 24-1 at 9.) It provided little explanation why.[10] (*See id.*)

The Court agrees with the reasoning in *Masten* and *DuBuske*. Under Section 1053(a)(2)(A)(ii), retirees with at least five years of employment have "a nonforfeitable right to 100 percent of the employee's accrued benefit derived from employer contributions." § 1053(a)(2)(A)(ii). Contrary to Defendants' suggestion, Section 1053(a)(2)(A)(ii)'s text does not limit its applicability to only those who reach "normal retirement age."[11] Congress could have included such language in Section

---

[10] Defendants also cite *Rossi v. Boston Gas Co.*, No. 88-0079-WGY, 1994 WL 548101 (D. Mass. July 7, 1994), but it is inapposite. Unlike here, *Rossi* involved a claim that a company stopped paying a discretionary allowance once its employees became eligible for Social Security. *Id.* at *1–2. The court determined that this practice was not a forfeiture because the allowance was "expressly not unconditional." *Id.* at *4 (cleaned up, citation omitted). In dicta, the court opined that even if it were a forfeiture, Section 1053(a) "does not apply to benefits forfeited before an employee's 'normal retirement age,' which . . . is age 65." *Id.* The court did not address Section 1053(a)(2)(A)(ii).

[11] Defendants argue in reply that Plaintiffs' Section 1053(a)(2)(A)(ii) argument is a "red herring." (ECF No. 35 at 13.) They cite *Laurent*, arguing that for anti-forfeitability to apply, a participant needs to have reached normal retirement age *and* satisfied the vesting requirements under Section 1053(a)(2)(A)(ii). (*Id.* at 14.) But in *Laurent*, the plan did not allow for early retirement. 794 F.3d at 276–77. The issue was that it set the normal retirement age at five years of service—exactly when an employee's benefits vested—so employees could not accrue interest ("whipsaw payments") on their benefits. *Id.* at 277. The Second Circuit interpreted ERISA's definition of "normal retirement age" to determine whether the plan violated the statute. *See id.* at 280–82. It

1053(a)(2)(A)(ii), like it did in Section 1053(a), but it did not. Instead, the provision instructs that "in addition" to the nonforfeitability of "normal retirement benefit[s]" upon reaching the "normal retirement age," an employee with at least five years of service also has a "nonforfeitable right to 100 percent of the employee's accrued benefit" before turning sixty-five. *Id.*; *see Masten*, 543 F. Supp. 3d at 29 (explaining that a "defined-benefit plan satisfies [the non-forfeitability] requirements if" it complies with Section 1053(a)(2)(A)(ii)).

Plaintiffs retired before the normal age of sixty-five. (Compl. ¶¶ 13–15.) They each worked at U.S. Bancorp for more than five years. (*Id.*) And Plaintiffs allege that Defendants' ECF methodology resulted in benefits that are not actuarially equivalent to what they would have received had they retired at age sixty-five. (*Id.* ¶¶ 6, 67, 77, 87 and 100.) Put simply, they allege that they did not receive their nonforfeitable accrued benefits. "[A]djustments in excess of reasonable actuarial reductions[] can result in rights being forfeitable." 26 C.F.R. § 1.411(a)-4(a); *see Masten*, 543 F. Supp. 3d at 36. Plaintiffs have stated a plausible claim to relief under Section 1053(a)(2)(A)(ii), so the Court therefore denies Defendants' motion to dismiss that claim.

---

did not discuss Section 1053(a)(2)(A)(ii) in the early-retirement context. If anything, the Second Circuit noted that "if a vested employee leaves employment before reaching retirement age," plans "cannot deprive the participants of the value that would accrue if the participants waited and took their distributions as an annuity at normal retirement age." *Id.* at 275.

## II.      Defendants' Motion to Strike Class Allegations

Plaintiffs bring a putative Rule 23 class action on behalf of themselves and the following class definition:

> All participants in the Plans, or their beneficiaries, (1) whose [benefit commencement date] is on or before March 1, 2016; (2) who received Part B annuity benefits that were reduced by the Part B ECFs; and (3) where the actuarial present value of their annuity benefit as of [benefit commencement date] was less than the actuarial present value of their age-65 [single life annuity] using the applicable Treasury Assumptions as of each participant's [benefit commencement date]. Excluded from the Class are Defendants and any individuals who are subsequently to be determined to be fiduciaries of the Plans.

(Compl. ¶ 78.) Defendants argue that Plaintiffs' class definition is an impermissible fail-safe class. (ECF No. 23 at 22–26.) "A fail-safe class is one that 'would allow putative class members to seek a remedy but not be bound by an adverse judgment—either those class members win or, by virtue of losing, they are not in the class and are not bound.'" *Vogt v. State Farm Life Ins.*, 963 F.3d 753, 768 (8th Cir. 2020) (quoting *Orduno v. Pietrzak*, 932 F.3d 710, 716 (8th Cir. 2019)); *see also Ford v. TD Ameritrade Holding Corp.*, 995 F.3d 616, 624 (8th Cir. 2021) (holding that a class definition that incorporated "contested elements of liability" was impermissible).

Under Rule 12(f) of the Federal Rules of Civil Procedure, "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "Judges enjoy liberal discretion to strike pleadings under Rule 12(f)." *Donelson v. Ameriprise Fin. Servs.*, 999 F.3d 1080, 1091 (8th

Cir. 2021) (citation omitted). But striking pleadings is a "drastic," "extreme[,] and disfavored measure." *Id.* at 1091–92 (citations omitted). The Eighth Circuit instructs that "a district court may grant a motion to strike class-action allegations prior to the filing of a motion for class-action certification." *Id.* Striking class allegations is "sensible" if it is apparent from the pleadings that "permitting such allegations to remain would prejudice the defendant by requiring the mounting of a defense against claims that ultimately cannot be sustained." *Id.* (citation omitted). Still, unless it appears "beyond doubt that [p]laintiffs cannot establish an actionable class action lawsuit," district courts regularly deny motions to strike class actions as "premature." *E.g.*, *Rios v. State Farm Fire & Cas. Co.*, 469 F. Supp. 2d 727, 741–42 (S.D. Iowa 2007).

Last year, the court in *Thorne* denied class certification to a different set of plaintiffs on related claims. There, the putative class included "all participants and beneficiaries of the . . . Plan, who began receiving pension benefits on or after December 14, 2012, and whose monthly benefits were reduced by an [ECF] prescribed in Part B of the Plan." 2021 WL 1977126, at *1. The court concluded that the class failed to satisfy Rule 23(a)'s commonality, typicality, and adequacy requirements. *Id.* at *1–2. It reasoned that none of the plaintiffs' proposed rate assumptions would result in higher benefits for all class members, so there would be intra-party disputes, differences among members' claims, and no common questions of law. *Id.* The court also stressed

that there was a standing issue because some members were receiving actuarially equivalent benefits, so they were without injury. *Id.* at *2.

Here, Defendants contend that Plaintiffs' second attempt at a putative class action impermissibly limits membership to those who would prevail on the ERISA claims, requiring the Court to engage in a merits evaluation to determine who is in the class. They also assert that the class definition precludes the possibility of an adverse judgment. Plaintiffs respond that the class is not fail-safe, and that striking the class allegations at this stage would be premature.

It is premature to strike Plaintiffs' allegations at this point in the litigation. Plaintiffs limit putative class membership to those Plan participants whose benefits are "less than" what they would have received had Defendants used the Treasury's assumptions. (Compl. ¶ 78.) As Defendants admit, the class is ascertainable— membership can be determined by comparing the present values of early-retirement benefits under the Plan versus the Treasury assumptions. (ECF No. 35 at 15); *see McKeague v. TMBC, Inc.*, 847 F.3d 992, 999 (8th Cir. 2017) ("Here, class members were identified by reviewing TMBC's customer files according to objective criteria.").

The Court concluded above that Plaintiffs have stated a plausible claim that Section 1054(c)(3) requires reasonable actuarial assumptions. Assuming Plaintiffs' factual allegations are true, and the Treasury assumptions are reasonable, Defendants are correct that Plaintiffs' putative class includes only those Plan participants who will

prevail on the merits. Participants are either in Plaintiffs' class with a successful ERISA claim, or they are outside the class, not bound by the Court's judgment, and free to pursue their own claim against Defendants. But that is not an impermissible fail-safe class. Class membership does *not* depend on the Court's finding of liability—the Court need not resolve a merits question to determine whether a participant is in the class. Rather, membership is based on objective criteria—present value calculations—that require no legal analysis. The Court therefore denies Defendants' motion to strike Plaintiffs' class allegations as premature.

## CONCLUSION

Based on the foregoing and on all the files, records, and proceedings herein, Defendants' motion to dismiss and strike class allegations (ECF No. 21) is DENIED.

Dated: October 17, 2022                    BY THE COURT:

                                           s/Nancy E. Brasel
                                           Nancy E. Brasel
                                           United States District Judge