**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| SUE ANN ADAMS, PATRICIA J. PETTENGER, and MARLA K. SNEAD, on behalf of themselves and all others similarly situated, | Case No. 22-CV-509 (NEB/LIB) |
| Plaintiffs, | ORDER ON MOTION TO EXCLUDE EXPERT TESTIMONY AND MOTION FOR SUMMARY JUDGMENT |
| v. | |
| U.S. BANCORP, THE BENEFITS ADMINISTRATION COMMITTEE, and JOHN/JANE DOES 1–5, | |
| Defendants. | |

Plaintiffs, former U.S. Bank employees, retired before turning sixty-five. To account for a longer benefits withdrawal period, their monthly pension needed to be adjusted downward. Under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA"), plan sponsors must ensure that those reduced early-retirement benefits are at least the "actuarial equivalent" of the benefits participants would have received had they retired at age sixty-five. Plaintiffs claim that their early-retirement benefits were excessively reduced because the underlying actuarial assumptions were unreasonable.

When denying Defendants' motion to dismiss, the Court left open whether actuarial equivalence, in practice, requires reasonable assumptions. Both parties

presented expert testimony on this question, and the record is developed. Defendants now move to exclude the testimony of Plaintiffs' expert, Ian Altman, and move for summary judgment. (ECF No. 164.) For the reasons below, the Court grants both motions.

## BACKGROUND

Plaintiffs are former employees of U.S. Bank and eligible for early retirement benefits. (ECF No. 1 ("Compl.") ¶¶ 4, 13–15.) Plaintiffs accrued "Part B" retirement benefits under the U.S. Bank Pension Plan ("Plan"). (*Id.* ¶¶ 2, 13–15; ECF No. 168-1 ("Plan Document") § 2.1.1.) The Plan is a defined-benefit retirement program that provides, in its simplest form, an annuity consisting of monthly payments from age sixty-five (the typical retirement age) until a retiree's passing. (Plan Document § 2.1.1.) Part B benefits support early retirement, and participants can start collecting benefits as early as age fifty-five. (*Id.*)

When an eligible employee retires early—*i.e.*, before turning sixty-five—the Plan requires a decrease in the employee's monthly pension amount. (*Id.* § 5.2.2, App'x C, § 4.) That decrease accounts, in part, for more years of payments. (Compl. ¶ 4.) ERISA mandates that plan sponsors cannot reduce those early-retirement benefits by an amount that puts them out-of-line with employees who retire at sixty-five. *See* 29 U.S.C. 1054(c)(3). In technical terms, the early retiree's monthly pension must be at least the "actuarial equivalent" of what they would have received if they retired at age sixty-five.

Plaintiffs claim that the Plan excessively reduced their monthly pension, meaning their early retirement benefits are less than the actuarial equivalent of the normal retirement benefits. (Compl. ¶ 5.)

## I.      Substantive Background

Actuarial equivalence, in this context, is a comparison between two different payment streams: early and normal retirement pensions. To determine whether an early retirement benefit is the actuarial equivalent of the normal (or "accrued") benefit, an actuary would first calculate the "actuarial present value" of the total future benefits that a participant would receive under each annuity.[1] (ECF No. 169 ("Terry Rep.") (sealed) ¶ 55.) If those present values are roughly equal, then the early retirement benefit is said to be the actuarial equivalent of the accrued benefit. (*Id.*)

When calculating present value, actuaries rely on two main assumptions about the future: the mortality rate and the interest rate. (*Id.* ¶ 65.) The mortality-rate assumption is used to predict how many people of a certain age will survive to reach the next year. (*Id.* ¶ 79 n.25.) Retirement plan annuities are contingent, meaning the plan sponsor will only issue monthly payments while the participant is living. (*Id.* ¶ 55 n.14.) The longer plan participants live, the more pension payments they will collect.

---

[1] An actuarial present value is the expected value of a series of contingent payments. (Terry Rep. ¶ 55 n.14.)

The interest-rate assumption represents the *time value of money*: "the fact that money available now is worth more than the same amount available at some future date, because one can earn investment returns in the interim on money that is available now." *Belknap v. Partners Healthcare Sys., Inc.*, 588 F. Supp. 3d 161, 165 (D. Mass. 2022). The interest-rate assumption is considered the most important element when determining actuarial equivalence. (Terry Rep. at 137.[2])

For ease of reference, actuaries for U.S. Bank simplified these two calculations into a table of "Early Commencement Factors" ("ECFs") in the Plan. (*Id.* ¶ 31.) ECFs are multipliers used to reduce a participant's early retirement benefits from the normal retirement benefits by a set percentage. (*Id.*) The decimal value corresponds to a ratio of the present values of the two annuity forms (*e.g.*, for age fifty-five, below, if the normal retirement benefit paid $1000 per month, then the early retiree would collect $380 per month). The Plan does not specify the underlying mortality- and interest-rate assumptions used to generate the ECFs. (Compl. ¶ 66.)

---

[2] Citations to the record reference ECF page numbers, except for deposition transcripts, which use native pagination.

**SECTION 4**

**EARLY COMMENCEMENT FACTORS**

The monthly amount payable pursuant to Section 5.2.2 shall be determined by multiplying the Participant's Accrued Benefit by the amount set forth below, based on the Participant's Attained Age on the Annuity Starting Date:

| Attained Age | Reduction Factor |
|---|---|
| 55 | 0.38 |
| 56 | 0.42 |
| 57 | 0.46 |
| 58 | 0.50 |
| 59 | 0.55 |
| 60 | 0.60 |
| 61 | 0.66 |
| 62 | 0.73 |
| 63 | 0.81 |
| 64 | 0.90 |
| 65 | 1.00 |

(Plan Document, App'x C, § 4.)

## II.   This Litigation

Plaintiffs' chief contention is that the Plan's ECF multipliers are "unreasonable, excessive, and punitive." (Compl. ¶ 5.) As a result, they claim they are receiving less in benefits than they are entitled to each month—*i.e.*, less than the actuarial equivalent. (*Id.* ¶ 6.)

In 2022, Plaintiffs brought this putative class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and others whose early-retirement benefits were reduced by the Plan's ECFs. (Compl. ¶ 78.) They seek declaratory and equitable relief under 29 U.S.C. § 1132(a)(3), which authorizes civil actions to redress ERISA violations. (*Id.* ¶ 88.) Plaintiffs allege two such violations: first, that the Plan's ECF

5

methodology resulted in early-retirement benefits that are not the "actuarial equivalent" of what they would have received had they retired at sixty-five, in violation of 29 U.S.C. § 1054(c)(3); and second, that the Plan's methodology required them to forfeit benefits in violation of 29 U.S.C. § 1053(a). (*Id.* ¶ 87.) Plaintiffs also bring a claim for breach of fiduciary duty based on the violation of those provisions.

Later that year, Defendants moved to dismiss the claims and to strike Plaintiffs' class allegations.[3] The Court denied both motions. *Adams v. U.S. Bancorp*, 635 F. Supp. 3d 742 (D. Minn. 2022). The motion to dismiss revolved around whether ERISA requires plan sponsors to assess actuarial equivalence using reasonable underlying assumptions. *Id.* at 746–47. Although it concluded that Plaintiffs had sufficiently stated a claim, the Court acknowledged that "discovery may reveal that the actuarial industry does not interpret 'actuarial equivalen[ce]' to require calculating benefits with reasonable rates and mortality figures." *Id.* at 754.

The record, now teeming with expert testimony, is developed. Plaintiffs rely on the expert report of Ian Altman, who concluded that the Plan's ECFs do not generate actuarially equivalent benefits relative to a set of mortality- and interest-rate assumptions

---

[3] The Court has since denied Plaintiffs' motion for class certification. (ECF No. 173.) Plaintiffs have moved for leave to file a renewed motion for class certification with a narrowed class definition. (ECF No. 178.) A Report & Recommendation granting that motion is now before the Court. (ECF No. 199.)

he considers reasonable. (ECF No. 170 ("Altman Rep.") (sealed) § 20.) For their part, Defendants turn to expert Thomas Terry; his rebuttal report lambasts Altman's, explains why the underlying assumptions need not be reasonable, and shows that the Plan's ECFs generate actuarially equivalent benefits. (Terry Rep. ¶¶ 14–18, 35.)

But Altman does not rebut Terry's report. Although Altman issued a supplemental expert report following Terry's, he only revised his calculation of losses for some participants. (ECF No. 168-5.) He did not otherwise change his core methodology or substantively respond to Terry's criticisms. (*Id.* at 3.) Plaintiffs later moved for leave to file another supplemental report from Altman in support of their motion for class certification, which the Court denied.[4] (ECF Nos. 138, 145.) And even if the Court had granted leave to file the report, it would have only included additional calculations from Altman based on newly-available data—not any true rebuttal. (ECF No. 139 at 3–4.)

Defendants now move to exclude Altman's testimony and move for summary judgment on all counts. (ECF No. 164.)

---

[4] That request was filed less than a week before the scheduled class certification hearing, and the parties had already moved for eleven extensions in this case. (ECF No. 145.)

## ANALYSIS

### I.      Motion to Exclude

### A.      *Legal Standard*

Rule 702 of the Federal Rules of Evidence governs the admission of expert

testimony. It provides:

> A witness who is qualified as an expert by knowledge, skill, experience,
> training, or education may testify in the form of an opinion or otherwise if
> the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will
>     help the trier of fact to understand the evidence or to determine a fact in
>     issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and
>     methods to the facts of the case.

When deciding a motion to exclude expert testimony under Rule 702, the Court

fulfills its gatekeeping role by "assur[ing] that evidence admitted in a case is both relevant

and reliable." *Sprafka v. Med. Device Bus. Servs., Inc.*, 139 F.4th 656, 660–61 (8th Cir. 2025).

To do so, the Court questions whether the proponent has demonstrated that the proffered

testimony satisfies each of the above admissibility requirements by a preponderance of

the evidence. Fed. R. Evid. 702 advisory committee's note to 2023 amendment. In

evaluating whether expert testimony is reliable, the Court must separate "expert opinion

evidence based on good grounds from subjective speculation that masquerades as scientific knowledge." *Sprafka*, 139 F.4th at 661 (citation modified).

### B.    Altman's Expert Testimony

Defendants move to exclude Altman's testimony under Rule 702, arguing that his idiosyncratic methodology for assessing actuarial equivalence is unreliable because it strays from standard practice among actuaries. (ECF No. 166 at 29, 32–33.) As proponents of Altman's expert testimony, Plaintiffs cannot meet their burden under Rule 702(c),[5] which requires them to establish by a preponderance of the evidence that Altman's testimony "is the product of reliable principles and methods." Fed. R. Evid. 702(c).

Altman insists that ERISA's actuarial equivalence requirement must be evaluated by comparing the actual ECFs under the Plan's terms *only* against ECFs calculated using the interest-rate assumptions taken from 26 U.S.C. § 417(e).[6] (Altman Rep. §§ 15–18; Terry Rep. ¶¶ 200–06.) This methodology (a) uses an inapposite interest-rate assumption (b) as

---

[5] Plaintiffs have generally met the requirements of Rule 702(a), (b), and (d). There is no dispute as to Altman's qualifications (he is a practicing actuary); he had sufficient data to run his ECF calculations; and Defendants do not challenge whether those calculations were technically correct. The key question is whether Altman's calculations were appropriate in the first place.

[6] The § 417(e) assumptions are mortality tables and interest rates published by the IRS which set the minimum present value of a lump-sum conversion a plan must provide to qualify for favorable tax treatment. 26 U.S.C. § 417(e).

a brightline point of comparison, rather than measuring the Plan's ECFs against a range of possible values.

Defendants' expert describes this framework as "based on a deeply flawed understanding of actuarial equivalence itself, a manufactured understanding of the relevant regulatory regime and actuarial professional standards, and a blind eye to decades of tradition and practice among actuaries and plan sponsors across the U.S." (Terry Rep. ¶ 35.) The Court agrees.

### 1. Selection of Interest-Rate Assumption

Altman's selection of § 417(e) segment rates as the interest-rate assumptions is not a reliable opinion because it is not in line with actuarial science or the practices of other actuaries. *See In re Wholesale Grocery Prods. Antitrust Litig.*, 946 F.3d 995, 1002 (8th Cir. 2019) (affirming exclusion of expert opinion whose "core assumption . . . was by the *ipse dixit* of [the expert]"); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 157 (1999) (affirming exclusion of expert testimony because there was "no indication in the record that other experts in the industry use" that method).

Despite working as an advisor for plan sponsors on plan design and operation for more than forty years, Altman himself could not recall ever advising a client to use these assumptions in the ECF context. (ECF No. 116-5 ("Altman Dep.") at 50, 65–68, 183.) Nor can he name a single pension plan that has used § 417(e) rates for its ECFs. (*Id.* at 148.)

For good reason: (a) the § 417(e) interest-rate assumption is intended for an entirely different actuarial context and (b) using it to calculate ECFs would generate unworkable practical burdens.

First, § 417(e) assumptions are intended for the limited purpose of converting a participant's normal benefit to a one-time lump-sum distribution, not modifying a regular payment stream. (Terry Rep. ¶ 37.) The Court observed as much at the motion-to-dismiss stage. *Adams*, 635 F. Supp. 3d at 753 ("Section 417(e) limits itself to restrictions on cash-outs" and these "'applicable' Treasury assumptions therefore apply only to lump-sum distributions." (citation modified) (citing *Belknap*, 588 F. Supp. 3d at 173 n.5)). As Defendants' expert explains, the "annuity payments at issue in this case are explicitly exempt from this requirement." (Terry Rep. ¶ 37.)

Second, Altman's methodology would require annually updating the underlying interest-rate assumption to reflect current market conditions. Because the § 417(e) assumptions mandate yearly updates, adopting Altman's framework would functionally insert into ERISA a legal requirement that plan sponsors update their plan's actuarial assumptions annually. (*Id.* ¶ 227.) Such a requirement for annual amendments would be "impractical and unprecedented." (*Id.* ¶¶ 36, 227.)

To explain further: Altman's approach would generate considerable administrative burdens for plan sponsors. Amending a plan brings with it several

qualification requirements, such as nondiscrimination testing and participant notice requirements. *See* 26 U.S.C. §§ 401(a)(4), 410(b); 29 U.S.C. §§ 1022(a), 1024(b)(1). It is a complicated and expensive endeavor, which Altman ignores in his report. (Terry Rep. ¶ 228.) Altman acknowledges in deposition testimony that "[i]f somebody were absolutely keen on doing it, it's possible they could work out a methodology [for using § 417(e) rates], but it would be complicated." (Altman Dep. at 152–53.) This type of friction runs contrary to the purpose of ERISA, through which Congress "sought to create a system that is not so complex that administrative costs, or litigation expenses, unduly discourage employers from offering ERISA plans in the first place." *Conkright v. Frommert*, 559 U.S. 506, 517 (2010) (citation modified).

And this lack of stability and predictability is disadvantageous for plan participants. The Supreme Court has observed that one of ERISA's principal aims is to "induc[e] employers to offer benefits by assuring a *predictable set of liabilities*, under uniform standards of primary conduct." *Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 379 (2002) (emphasis added); *see Conkright*, 559 U.S. at 517 (same). Annual changes would create shifting sands for participants, leaving them uncertain of the benefits they will receive under their plans. (Terry Rep. ¶¶ 228–29.)

12

*2.*    *Bright-line Evaluation of Plan's ECFs*

Making matters worse, Altman incorporates his § 417(e) assumptions into an excessively rigid methodology. Typically, to assess whether a pension plan's ECFs generate actuarially equivalent benefits, an actuary compares those ECFs to factors generated from different combinations of mortality and interest rate assumptions. (*Id.* ¶ 152.) Altman's approach, which assesses the Plan's ECFs against a single data point rather than a range of values, is so unconventional as to be unreliable.

Although inappropriate for use in this context, § 417(e) assumptions could have lent themselves to the typical methodology. That statute provides for fifteen permutations of market-rate assumptions (when converting to a lump-sum benefit), mixing and matching different stability periods and look-back months. 26 C.F.R. § 1.417(e)–1(d)(4). Altman acknowledges that different combinations of § 417(e) assumptions generate varying thresholds for actuarial equivalence—some above and some below where he sets the line. (Altman Dep. at 178–79; Terry Rep. ¶¶ 260–263.)

But rather than testing all permutations and turning their thresholds into a range against which to compare the ECFs in the plan, Altman picked just one—and worse, did not have a "specific reason for picking one versus the other." (Altman Dep. at 178–79.) Instead, Altman took a more simplistic route. He first calculated the present values of the early- and normal-retirement payment streams relative to his set of § 417(e) assumptions

13

for each year of early retirement. (Altman Rep. §§ 3, 20 & Table 5.) Next, he calculated the

ratio between those two present values. (*Id.*) Finally, he compared that ratio to the Plan's

corresponding ECF to see if it was higher or lower at each age. (*Id.*) If the ECF was lower

than Altman's calculated ratio, then he deemed it "excessive" and not actuarially

equivalent. (*Id.* § 20.) His findings for the Part B participants are summarized in the table

below:

| Age | Plans' ECFs for Part B | ECFs Generated by 2022 417(e) Factors | % Difference |
|-----|------------------------|---------------------------------------|--------------|
| 55  | .38                    | 0.55                                  | 44.7%        |
| 56  | .42                    | 0.58                                  | 38.1%        |
| 57  | .46                    | 0.62                                  | 34.8%        |
| 58  | .50                    | 0.65                                  | 30.0%        |
| 59  | .55                    | 0.69                                  | 25.5%        |
| 60  | .60                    | 0.73                                  | 21.7%        |
| 61  | .66                    | 0.78                                  | 18.2%        |
| 62  | .73                    | 0.83                                  | 13.7%        |
| 63  | .81                    | 0.88                                  | 8.6%         |
| 64  | .90                    | 0.94                                  | 4.4%         |

(Altman Rep. § 20 Table 5.)

So not only did Altman use the § 417(e) assumptions in the wrong context, he

provided no frame of reference for them. In other words, Altman's methodology does

not provide for a range of values that could be actuarially equivalent, as is standard

practice. (Terry Rep. ¶¶ 68, 70.) Instead, Altman offers only a single point of comparison.

14

Altman's insistence on rigidity balks at a core principle of actuarial science. Actuarial Standard of Practice No. 1,[7] Section 2.10—applicable to all areas of actuarial practice—states that "because actuarial practice commonly involves the estimation of uncertain events, there will often be a range of reasonable methods and assumptions." (*Id.* ¶¶ 70–71 & n. 21.) Although Plaintiffs argue that ranges are generally not *required*, they do not contest that a range of outputs is nevertheless *preferred* in this context. (ECF No. 188 at 28.)

3.    *Rule 702 Analysis*

As a whole, Altman's methodology is untested, unsupported, and ultimately unreliable. He cites no support or similar actuarial practice, instead bootstrapping the methodology from his "professional opinion." (Altman Rep. § 16.) But an expert's mere subjective belief or unsupported speculation is not a sufficient basis for an expert's opinion—rather, it must be based on legitimate principles and reliable methods.

Altman gives the Court no reason to believe that his methods are generally accepted in the field. *Peitzmeier v. Hennessy Indus., Inc.*, 97 F.3d 293, 297–98 (8th Cir. 1996)

---

[7] The Actuarial Standards of Practice ("ASOPs"), issued by the Actuarial Standards Board, provides guidance for appropriate actuarial practice in the United States. (Terry Rep. ¶ 71 n.21.) "Some ASOPs, including ASOP No. 1, are applicable to all areas of actuarial practice, while others are narrowly applicable according to their stated scope." (*Id.*)

(excluding expert opinion when the proponents "offer[ed] no testimony regarding the general acceptance of either [the expert's] theory or his methodology"). He cites no industry publication, academic study, peer-reviewed literature, or other like sources— save for a general proposition from one actuarial exam study note. (Altman Rep. § 4 & § 3 n.7 ("On a bigger picture level, actuaries know that they must use reasonable assumptions when they measure the risk for their clients." (citing Jeff L. Schwartzmann & Ralph Garfield, *Educ. & Examination Comm. of the Soc'y of Actuaries, Actuarially Equivalent Benefits*, EA1-24-91 (1991))).) Altogether, these glaring flaws indicate that Altman does not meet his burden under Rule 702 to provide a reliable account of actuarial equivalence. Fed. R. Evid. 702 (permitting an expert to "testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that" the testimony is reliable).

### C.    Other Cases

Plaintiffs protest exclusion by citing cases across the country where Altman's testimony on this issue has not been excluded. Yet Rule 702 motions in this context turn on the unique factors of the Plan at issue, the procedural posture, and the arguments made. All of the cases cited by Plaintiffs differ in material ways from the arguments the Court has been presented here. *See, e.g., Scott v. AT&T*, No. 20-CV-7094, ECF No. 119-8, at 24 (Altman Rep.) (N.D. Cal. June 6, 2022) (Altman's report expressly acknowledges

that those § 417(e) assumptions "are not the only reasonable actuarial basis for determining" the converted benefits); *Masten v. Metro. Life Ins.*, No. 18-CV-11229 (S.D.N.Y.) (no motions to exclude expert testimony); *Berkeley v. Intel Corp.*, No. 23-CV-343 (N.D. Cal.) (no motions to exclude expert testimony); *Urlaub v. CITGO Petroleum Corp.*, No. 21-CV-4133 (N.D. Ill.) (no motions to exclude expert testimony); *Belknap v. Partners Healthcare Sys., Inc.*, No. 19-CV-11437 (D. Mass.) (no motions to exclude expert testimony). None of these cases persuade the Court that Plaintiffs carry their Rule 702 burden here.

## II.     Motion for Summary Judgment

"Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 792 (8th Cir. 2012) (citing Fed. R. Civ. P. 56(c)). A dispute of fact is "genuine" if a factfinder could reasonably determine the issue in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court considering a summary judgment motion must view the facts in the light most favorable to the nonmovant and give that party the benefit of all reasonable inferences supported by the evidence. *Dallas v. Am. Gen. Life & Acc. Ins.*, 709 F.3d 734, 736 (8th Cir. 2013). "The burden of demonstrating an absence of a genuine dispute of material fact" is on the movant. *Farver v. McCarthy*, 931 F.3d 808, 811 (8th Cir. 2019) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If

17

the movant satisfies the burden, the nonmovant "must present specific evidence, beyond mere denials or allegations that raise a genuine issue for trial." *Id.* (citation modified).

## A.    Actuarial Equivalence

It is not entirely clear on what basis Plaintiffs allege that the Plan violates ERISA. In their brief, Plaintiffs say that their challenge "concerns [(a)] whether the Plan's terms applied across the board to all similarly situated participants violate ERISA and [(b)] the actuarial assumptions that should be selected by an actuary to evaluate whether the Plan violated ERISA." (ECF No. 188 at 14.) Plaintiffs also make clear that they "do not allege their benefits were miscalculated under the Plan's terms." (*Id.* at 15.) Ultimately, Plaintiffs' theory collapses into the core allegation that the Plan's ECFs do not generate actuarially equivalent early-retirement benefits.

### 1.    Reasonableness of Actuarial Assumptions

ERISA's actuarial equivalence provision contains no explicit requirement that a plan must use reasonable assumptions when reducing early retirement benefits:

> [I]n the case of any defined benefit plan, if an employee's accrued benefit is to be determined as an amount other than an annual benefit commencing at normal retirement age, or if the accrued benefit derived from contributions made by an employee is to be determined with respect to a benefit other than an annual benefit in the form of a single life annuity (without ancillary benefits) commencing at a normal retirement age, the . . . benefit . . . shall be the *actuarial equivalent* [of an annual benefit commencing at normal retirement age].

18

29 U.S.C. § 1054(c)(3) (emphasis added). Nor has Congress defined the term "actuarial equivalent." *Stephens v. U.S. Airways Grp.*, 644 F.3d 437, 440 (D.C. Cir. 2011). At the motion-to-dismiss stage, the Court used various tools of statutory interpretation to conclude that a reasonableness requirement is *consistent* with ERISA's structure and purpose. *Adams*, 635 F. Supp. 3d at 753–54 (concluding that Plaintiffs stated a plausible Section 1054(c)(3) claim).

But the Court left open the question of whether actuarial equivalence, as it is understood by actuaries, *requires* reasonable underlying assumptions. *Id.* at 754. The Court reasoned that "[i]f 'Congress has used technical words or terms of art, it is proper to explain them by reference to the art or science to which they are appropriate.'" *Id.* at 751 (quoting *Corning Glass Works v. Brennan*, 417 U.S. 188, 201 (1974)). Recognizing that "discovery may reveal that the actuarial industry does not interpret 'actuarial equivalen[ce]' to require calculating benefits with reasonable rates and mortality figures," the Court deemed it "an issue best left for a court equipped with [a] well-developed record." *Adams*, 635 F. Supp. 3d at 754.

The record is now developed. In line with expert testimony, the Court concludes that actuarial equivalence does not require reasonable underlying assumptions.

Actuarial equivalence is an exercise in relative comparison of value under consistent assumptions, not absolute value. Actuarial equivalence assesses whether the

19

early-retirement and normal-retirement benefits have the same actuarial present value, and the present value of each payment stream is calculated under the same set of assumptions. (Terry Rep. ¶ 65.) This definition accords with caselaw and agency guidance. *See Stephens*, 644 F.3d at 440 (holding that actuarial equivalence means "[t]wo modes of payment" are "equal under a given set of assumptions"); 26 C.F.R. § 1.401(a)(4)-12 (defining actuarial equivalence as "[a]n amount or benefit is the actuarial equivalent of, or is actuarially equivalent to, another amount or benefit at a given time if the actuarial present value of the two amounts or benefits (calculated using the same actuarial assumptions) at that time is the same"). As Terry explains, "[a]ctuarial equivalence defines a mathematical *process*" without any mandates for what the underlying assumptions are.[8] (Terry Rep. ¶ 68 (emphasis added).) For example, to determine whether two objects are the same weight, it does not matter if the scale is off by five pounds—so long as both objects are weighed on the same scale.

As a result, a retirement plan's underlying assumptions need not be reasonable in order to generate actuarially equivalent benefits. This conclusion intuitively aligns with actuarial science writ large. "[A]ctuarial analysis and related calculations involve

---

[8] And neither ERISA nor related Treasury regulations specify any particular assumptions to be used when assessing actuarial equivalence, even though it has done so in other contexts like lump-sum conversions and other accelerated forms of payment. (Terry Rep. 96 & n.36.)

assumptions about uncertain future events, and there is rarely, if ever, a single 'correct' set of assumptions about the future." (*Id.* ¶¶ 70, 129.)

Because there is no one set of correct assumptions for calculating present value, a plan's actuarial equivalence is properly assessed in reference to those assumptions and conversion factors stated in the plan document. (*Id.* ¶ 64.) Actuarially equivalent benefits may not have the same value under different sets of assumptions—*e.g.*, if two objects are weighed on different scales. (*Id.* ¶ 67.) To avoid apples-to-oranges comparisons, actuaries assessing a retirement plan will "always" make those calculations according to a plan's specifications. (*Id.* ¶ 64.) Ultimately, "the only relevant place where 'actuarial equivalence' is defined is in the Plan itself." *Belknap*, 588 F. Supp. 3d at 175. Here, the Plan defines "actuarial equivalent" as "a benefit of equal value computed on the basis of the tables, factors and assumptions set forth in this Plan Statement." (Plan Document § 2.1.2.)

Courts deciding this question on summary judgment have drawn narrow conclusions based on the expert testimony before it. *Compare Scott*, 790 F. Supp. 3d at 790 (reasoning that "the record [here] is very different [than in *Belknap*] with respect to what constitutes actuarial equivalence in the field"), *with Belknap*, 588 F. Supp. 3d at 174 (reasoning that "both of plaintiff's experts unambiguously testified that if a plan defines 'actuarial equivalence,' then the actuary should use the plan's actuarial assumptions to calculate a participant's benefit"). So too here.

21

And, even if ERISA and actuarial equivalence required reasonable assumptions, Plaintiffs do not have evidence that the Plan's assumptions are unreasonable. With Altman's testimony excluded, Plaintiffs may not rely on mere allegations that the mortality- and interest-rate assumptions are outdated. *See Davis v. U.S. Bancorp*, 383 F.3d 761, 765 (8th Cir. 2004).

Defendants also make an affirmative case for the reasonableness of the Plan's ECFs. To start, U.S. Bank argues that the two main assumptions are not outdated simply because they are two decades old; they reflect trends over time. "[P]ensions are long-term promises based on benefits earned throughout a career and then paid for many years (even decades) in retirement. Accordingly, a benchmark of reasonableness is not necessarily determined based on any single point in time." (Terry Rep. ¶ 131.)

And Terry testified that the Plan's mortality-rate assumption is reasonable because current life expectancy in the United States is nearly unchanged from 2002, when the ECFs were introduced into the Plan. (Terry Rep. ¶¶ 139–40 & Fig. 1 (citing CDC tables of life expectancies in the U.S.); *see also id.* ¶ 139 ("[T]he Complaint's characterization of 'substantial changes in mortality' since 2002 and that 'life expectancies increased by four years' is simply inaccurate.").)

Likewise, Terry's report argues that the Plan's interest-rate assumption is reasonable. Though there have been fluctuations, capital market investment returns have

22

not meaningfully changed since 2002, when the ECFs were put into the Plan. (*Id.* ¶ 34.) Long-term capital market expectations are an appropriate benchmark for evaluating interest-rate assumptions because that assumption accounts for the time value of money—*i.e.*, the forgone investment returns on the Plan's assets. (*Id.* ¶¶ 145–48.)

And Terry compared the ECFs against a range of factors generated from different combinations of reasonable mortality and interest rate assumptions. (*Id.* ¶ 152.) According to his findings, summarized in the below table, the ECF at each age fell within the range generated from these benchmarks.

| Commencement Age | Part B (ECF) | Range of ECFs Based on Relevant Benchmarking Assumptions |
|---|---|---|
| 64 | 0.90 | 0.90 – 0.91 |
| 63 | 0.81 | 0.81 – 0.82 |
| 62 | 0.73 | 0.73 – 0.75 |
| 61 | 0.66 | 0.65 – 0.68 |
| 60 | 0.60 | 0.59 – 0.62 |
| 59 | 0.55 | 0.53 – 0.57 |
| 58 | 0.50 | 0.48 – 0.52 |
| 57 | 0.46 | 0.44 – 0.47 |
| 56 | 0.42 | 0.40 – 0.43 |
| 55 | 0.38 | 0.36 – 0.40 |

(*Id.* ¶ 162 & Fig. 3.) Thus, Terry concluded that the Plan's ECFs are reasonable. (*Id.* ¶ 163.)

23

2.      *Consistent Expert Testimony*

Even if Altman's expert testimony were admissible, his conclusions do not rebut the Plan. Summary judgment is typically not appropriate when there is a "head-to-head battle of the experts." *In re RFC & RESCAP Liquidating Tr. Action*, 332 F. Supp. 3d 1101, 1168–69 (D. Minn. 2018) (citation modified). That is not what is presented here *even if* Altman's testimony is considered. Altman and Terry do not actually "battle." *Cf. Wills v. Encompass Ins.*, 47 F.4th 900, 904 (8th Cir. 2022) ("[S]ummary judgment was improper" because "[t]he conflict between these expert witnesses created a genuine dispute of material fact").

Both experts acknowledge that actuarial science is unpredictable, such that two actuaries can use different methods or assumptions and reach different but reasonable results. Altman acknowledges that other reasonable assumptions exist, including some that could produce a different threshold for actuarial equivalence. (Altman Dep. at 76, 107–08, 240.) And Terry stresses that "actuarial practice commonly involves the estimation of uncertain events" and that "[o]ne actuary's professional judgment, if different from another's, does not invalidate either actuary's professional judgment." (Terry Rep. ¶¶ 68, 71.)

In the actuarial equivalence context, this both-can-be-right concept makes sense. Actuarial equivalence assesses whether the early-retirement and normal-retirement

24

benefits have the same actuarial present value relative to a given set of assumptions. (*Id.* ¶ 65.) As a result, the same early-retirement and normal-retirement benefits could be actuarially equivalent under one set of assumptions, and not actuarially equivalent under another. (*Id.* ¶ 67 ("[I]f Actuary #1 selects one set of appropriate actuarial assumptions to perform an actuarial equivalence calculation, and Actuary #2 selects a different set of appropriate actuarial assumptions, the actuaries will have used the same mathematical process, but will not necessarily compute the exact same actuarially equivalent benefit.").)

Altman evaluates actuarial equivalence relative to his assumptions, not the Plan's. (Altman Rep. § 20.) By running his calculations under a different set of mortality- and interest-rate assumptions, those conclusions say nothing about whether the *Plan's* assumptions generate actuarially equivalent ECFs. In fact, Altman concludes that the Plan's factors are "excessive *compared to* the ECFs generated by the 417(e)-derived factors that I have deemed reasonable." (*Id.* (emphasis added).)

Terry's calculations demonstrating the Plan's actuarial equivalence stand unrebutted. The Plan's ECFs are all within a range of reduction factors that generate actuarially equivalent early retirement benefits. (Terry Rep. ¶¶ 162–63.) Altman does not testify outright that the Plan's mortality- and interest-rate assumptions are unreasonable. He says, generally, that "any ECFs that were based on reasonable actuarial factors over

25

20 years ago would not be expected to be reasonable today." (Altman Rep. § 5.) Again, this assertion does not show or explain why the *Plan's* assumptions are unreasonable. And Altman explicitly acknowledges that other assumptions, beyond those he used in his framework, could be reasonable and generate actuarially equivalent ECFs.

Altman's failure to rebut the Plan or Terry's report distinguishes this case from others that survived summary judgment. In *Urlaub*, for example, the court reasoned that Altman had "expressly opined that Terry's alternative assumptions are *not* reasonable," thereby creating a genuine dispute. *Urlaub v. CITGO Petrol. Corp.*, 750 F. Supp. 3d 863, 875–76 (N.D. Ill. 2024). Here, Altman issued a brief supplemental report in which he revised his own calculation of losses for some participants but otherwise did not change his core methodology or substantively respond to Terry. (ECF No. 168-5 at 3.) At most, Altman stated he "reject[s] many of [Terry's] criticisms," without providing any additional detail. (*Id.*) This threadbare assertion falls far short of the "battle of the experts" necessary to survive summary judgment.[9]

---

[9] Nor would Altman's Third Supplemental Report, which the Court did not permit Plaintiffs to file, have provided the rebuttal necessary to generate a dispute of fact. (*See* ECF No. 139 at 3–4 (stating Altman's intent to perform additional calculations based on newly available data—not a substantive response to Terry's report).)

### B.      Breach of Fiduciary Duty

Plaintiffs' claim for breach of fiduciary duty depends on there being a violation of ERISA. *See* 29 U.S.C. § 1132 (a)(3) (providing a remedy for a violation of "any provision of this subchapter"). As established above, the Court concludes that the Plan does not violate ERISA. So regardless of whether Defendants are fiduciaries under ERISA,[10] Plaintiffs cannot prevail on this count.

### CONCLUSION

Based on the foregoing and on all the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.      Defendants' motion to exclude the expert testimony of Ian Altman (ECF No. 164) is GRANTED;

2.      Defendants' motion for summary judgment (ECF No. 164) is GRANTED; and

3.      Plaintiffs' motion for leave to file a renewed motion for class certification (ECF No. 178) is DENIED AS MOOT.

---

[10] Defendants argue that they are not fiduciaries and therefore do not owe fiduciary duties to Plaintiffs in the administration of the Plan. (ECF No. 166 at 44–45.)

LET JUDGMENT BE ENTERED ACCORDINGLY.


Dated: January 16, 2026                              BY THE COURT:

                                                     s/Nancy E. Brasel
                                                     Nancy E. Brasel
                                                     United States District Judge